Owen C. and Anoutsiata **TAYLOR**,
Appellants,

v.

Rocky Lynn **KEIRN**, Respondent.

No. WD 31341.

Missouri Court of Appeals,
Western District.

Sept. 29, 1981.

J. Michael Murphy, Liberty, for appellants.

Theodore J. Furry, Birmingham & Furry, Kansas City, for respondent.

Before KENNEDY, P. J., and SHANGLER and WASSERSTROM, JJ.

SHANGLER, Judge.

The plaintiffs Taylor [husband and wife] sued defendant Keirn for damages for personal injury to the husband and loss of consortium to the wife from an automobile collision. The jury returned verdicts adverse to the petition. The plaintiffs contend on appeal that the court, among other errors, submitted instructions not supported by the evidence and refused others the evidence warranted.

The vehicles collided at the entranceway to the Ford Motor plant in Claycomo which formed a T intersection with U.S. Highway 69 at that site. It was an October morning, about 5:40 a. m., and still dark, so that the vehicles on the road used headlights. The highway, with occasional variation, ran east and west. The pavement of U.S. 69 consisted of four lanes, two for eastbound and two for westbound traffic, each lane ten feet wide. The two eastbound lanes increased to three some six hundred feet west of the intersection. The southernmost [the third] of the eastbound lanes facilitated traffic into the Ford plant and, by marks and legends, was reserved for that exclusive purpose. These traffic lanes of U.S. Highway 69 as they approached the intersection were separated by a median strip. Signal lights at the intersection controlled traffic from the east and the west and from the

Ford plant. The intersection signals included a left-hand turn arrow to control movement from westbound U.S. 69 onto the entrance road to the Ford plant. The speed limit on the highway was 40 miles per hour.

The plaintiff Taylor operated a Ford LTD eastward on U.S. 69 into the intersection at the time of the collision. Just earlier, he had driven through the intersection from the opposite direction to deliver a family member to a bus stop. The defendant Keirn was on his way to work at the Ford plant. He drove a Vega west on U.S. 69, moved into the intersection and turned left into the area between the medians. At the time of collision, the Vega was stopped southwestwardly, poised to complete the turn and cross the eastbound lanes of the highway onto the entrance road to the Ford plant to the south. The signal lights exhibited green for east and west traffic at the time the cars moved into the intersection. The defendant Keirn placed the Vega somewhat north of the proximate eastbound lane [or, the north curb line of the median strips] at the time of collision, but conceded the possibility that the Vega front bumper intruded into that eastbound lane. There was damage to the left front fender of the Vega, and to the left side of the Ford. The police investigator placed the debris of the collision some two feet south of the north curb line in the eastbound lane of the highway.

The plaintiff Taylor gave this account of the occurrence: As he came within two hundred feet of the intersection, he moved the automobile from the right eastbound lane of U.S. 69 into the left lane in order to avoid the congestion of the traffic flow into the Ford plant ahead. His speed then was 25 miles per hour, but after maneuver into the left lane, he accelerated the vehicle to 35 miles per hour and maintained that speed into the intersection. The roadway declined towards the intersection from that point, two hundred feet to the west, and he saw clearly then that the traffic light for travel to the east was green. As the plaintiff proceeded on the left lane into the intersection, he saw "traffic waiting to turn

into the Ford Plant [then] as I got about half-way through the intersection there was an impact. I was struck." The plaintiff placed the collision in the center of that eastbound lane. The trial testimony of the plaintiff was that the traffic he saw in the intersection as he approached was not the car of the defendant, but a car which faced due south as if to enter the Ford plant. That testimony was also that he never saw the Vega before the collision. The plaintiff disclaimed a deposition statement that as he approached the intersection from some two hundred feet away he saw two cars westbound, headlights on, in posture to turn left [as the car signals indicated] and another— that the other car in the collision [which he assumed was that of the defendant] was stopped in the median area—and remained stopped—as the plaintiff came into the intersection. Also, the plaintiff disagreed with the testimony of the investigative officer that Taylor reported he ran into the Keirn vehicle. There was other police testimony that Taylor made no mention of a third car at the time of the investigation— but only that his car struck the Vega about to complete a left turn.

The account of defendant Keirn was somewhat at variance with the narrative given by the plaintiff: Keirn and passenger Collins were enroute to work at the Ford plant. [Collins was asleep until after the impact and was without knowledge of the events which intervened.] Keirn was westbound on U.S. 69 highway and, at the intersection, turned left into the median area with the green light [not the arrow] to proceed onto the Ford plant entrance road to the south, when he noticed a car some 200 feet to the west [the Taylor vehicle] in the northernmost traffic lane. Keirn stopped to yield the right-of-way to the vehicle which approached. The Keirn vehicle was in the posture of turn and was poised southwesterly, headlights on and turn signal in operation, and waited for the other car to pass. Keirn said his Vega was the only vehicle from the west in the intersection at the time. As the Taylor car continued down the hill into the intersection, it gradually but steadily drifted to the left, clipped the Vega still stopped and came to rest across the intersection to the southeast. Keirn testified that the eastbound lanes were clear of traffic except for the Taylor vehicle. There was no other vehicle between them, from his first notice of the Taylor car some 200 feet away until the time of collision.

■■■ The court submitted the contributory negligence of the plaintiff by Instruction 5 on the multiple acts of failure to keep a careful lookout or failure to swerve to avoid collision. [MAI 32.01 and 17.04]. The plaintiff Taylor complains there was not sufficient evidence that he failed to swerve to avoid collision. To sustain argument, Taylor argues the effect of *his* evidence. The submission, however, was on the theory of the *defense* evidence and our review concerns only whether the quality of that proof sustains instruction. *Saupe v. Kertz,* 523 S.W.2d 826, 830[4, 5] (Mo. banc 1975). The theory of failure to keep a careful lookout does not become submissible unless the evidence shows the motorist by careful lookout [in the highest degree of care] could have seen the other vehicle in time to have taken effective precautionary action. *Heberer v. Duncan,* 449 S.W.2d 561, 563[3] (Mo. banc 1970). The evidence of defendant Keirn that from the time he turned left into the intersection he had an unobstructed view of the Taylor course of travel for some two hundred feet until collision, allows a reciprocal inference that the Vega already in the intersection and stopped, was also clearly visible to the plaintiff throughout that span of distance and time.

The plaintiff does not contend the evidence did not prove failure of lookout and resort to *some* available precautionary action, but only that a swerve was not a means open to him. The plaintiff argues that the evidence of the defendant did not place the Vega in the lane of the oncoming Ford, so there was no duty on the plaintiff to swerve—a duty which arises [so the plaintiff perceives *Hecker v. Schwartz,* 426 S.W.2d 22 (Mo.1968) to hold] only when the other vehicle moves onto the wrong side of the highway and so creates a reasonable

likelihood of collision. That argument, once again, posits the theory of recovery and not the theory of defense. The evidence of the plaintiff was that the eastbound Ford remained in the proper lane throughout its course. The evidence of the defendant—upon which the propriety of the failure to swerve submission rests—was that the Vega remained stopped in the median area north of the traveled eastbound lanes or, perhaps, encroached only slightly. The theory of the defense submission was that, however positioned on the highway, the Vega was in full view of the plaintiff for some two hundred feet, immobile and lighted; that the eastbound lane to the right was open so that [as plaintiff concedes] he could have moved the Ford to the right and avoided collision had the plaintiff seen the Vega, but that Taylor neither saw nor acted.

That the Vega encroached upon the eastbound lane affected the duty of the other motorist only to the extent that such a position constricted the area to swerve. In this case, the infringement [two feet by the most unfavorable measure] notwithstanding, there remained to the plaintiff eight feet of the left eastbound lane and all of the ten feet of the right eastbound lane to maneuver a swerve. Taylor testified that he drove the two hundred feet into the intersection at 35 miles per hour. At that speed, a car elapses some 42 feet of highway during the normal three-quarter second reaction time by a motorist to danger. *Ochs v. Wilson*, 427 S.W.2d 748, 752[7–9] (Mo.App.1968). That a modern car is quick to respond and mobile for maneuver are facts of judicial notice. *Jenkins v. Jordan*, 593 S.W.2d 236, 239[5, 6] (Mo.App. 1979). Thus, there remained to the plaintiff more than 150 linear feet of open highway and [at the least] 18 lateral feet of lane to avoid collision. The evidence favorable to submission was, nevertheless, that the plaintiff throughout the course of two hundred feet, by a relentless movement, simply drifted into the Vega and clipped the left front of that vehicle. A jury could find that a swerve of inches to the right was a means available to the plaintiff to avoid

collision and that the neglect to take that precaution was the proximate result of the casualty. *McWilliams v. Wright*, 460 S.W.2d 699, 701[1] (Mo.1970).

The rationale of *Hecker v. Schwartz*, supra, contrary to the contention of the plaintiff, does not apply to exculpate Taylor from a duty to act under the evidence. *Hecker* holds, consistently with principle, that a duty to swerve [or to take other evasive action] does not arise until the motorist knows or should know that a likelihood of collision exists absent precaution—and that in the case of oncoming traffic [l.c. 26[4, 5]] that duty does not arise until likelihood that the opposite vehicle will invade the wrong side of the roadway. The duty of a motorist to look out for danger to another on the highway remains constant [*Miller v. St. Louis Public Service Company*, 389 S.W.2d 769, 771[2] (Mo.1965)], but when the concomitant duty arises to act to avoid the danger and what the action must be depend upon the circumstances of the case [*Graham v. Conner*, 412 S.W.2d 193, 202[9–14] (Mo.App.1967)]. *Hecker* involved two vehicles each in motion and each from an opposite direction. Here, the plaintiff Taylor only was in motion and that movement was lateral to a car already stopped when first observable by lookout, and which remained stopped. The danger, therefore, was not from any movement by Keirn into the path of the Taylor car [as, by analogy, in *Hecker*] but from the continued drift of the Taylor car into the stationary Keirn car. It was the theory of the defense that the Vega stood wholly outside the traveled lanes of eastbound U.S. 69 as it awaited the passage of the Ford. There was substantial evidence to sustain that theory. That alone renders *Hecker* totally without analogy. If the evidence of the defendant must be taken to concede that the Vega encroached somewhat on that eastbound space so that, by some analogy of circumstance, the rationale of *Hecker*—that the duty to act does not arise until the other vehicle crosses upon the "wrong half of the roadway"—applies, then that precondition of danger attended the operation of the plaintiff Ford

throughout the course of travel into the intersection lane partially preempted by the defendant's Vega. The submission of Instruction 5 of the failure to swerve as a predicate of the contributory negligence of the plaintiffs rests on substantial evidence.

The court submitted the recovery for the plaintiffs on Count I [damages for injury to the husband] and Count II [loss of consortium] on the single theory that the defendant failed to yield the right-of-way. The plaintiffs complain that they were entitled to submit also the failure of the defendant to keep a careful lookout, proffered to the court but refused.

A party may support an instruction by any evidence favorable to the theory of submission, from whatever source. In that exercise, the testimony favorable to the plaintiff [or other proponent of instruction] is taken as true and the evidence of the adversary is discarded except as it aids the submission of the proponent. *Forbis v. Associated Wholesale Grocers, Inc.*, 513 S.W.2d 760, 763[1, 2] (Mo.App.1974). Thus, in the usual course, the plaintiff Taylor was entitled to the inference from the evidence of the defendant Keirn that—for the time and from the place the Vega was visible to the plaintiff by lookout—so, reciprocally, was the Ford visible to the defendant by lookout. A party, however, may disclaim the benefit of the evidence of an adversary by a positive testimony of a fact peculiarly known to the party which contradicts the evidence of the adversary. In the absence of explanation that the statement was mistaken, misunderstood or the result of other lapse, [*Hecker v. Schwartz*, supra, l.c. 25]: "the party may not have the benefit of any testimony which is contrary to his own testimony, whether given by himself, by his adversary's witnesses, or by his own witnesses." See also, *Burris v. Kansas City Public Service Co.*, 226 S.W.2d 743, 747[1–4] (Mo.App.1950).

To prove a submissible failure of lookout theory, the plaintiff required an inference from the evidence that the defendant Keirn, had he looked, could have seen the Ford in time for precautionary action. That inference can derive only from evidence that the defendant was at a place where a view was open to him and at a time when the exercise of a precaution would be effective. It may be that the very evidence of the defendant—that the view between the oncoming Ford and the immobile Vega was unobstructed throughout the course of that approach—suffices for such an inference. The plaintiff, however, repudiated that version of events. His trial testimony insisted, rather, that the car at the intersection—stopped and faced directly south [rather than southwestwardly as the defendant described the position of his vehicle]—was *not* the Vega of the defendant. In fact, as that testimony iterated repeatedly, the plaintiff never saw the defendant at all prior to the collision. The Vega appeared suddenly as the Ford passed the stopped car. The unequivocal effect of that testimony is that Keirn, shielded by the other stopped car, was never visible to the plaintiff before impact. In the absence of other, consistent testimony by the plaintiff as to the location of the defendant before the collision, from which vantage Keirn could see the Taylor vehicle [albeit Taylor could not then see the Vega], there was no proof that lookout by the defendant would have disclosed the plaintiff or that, even so, the defendant had the means to avoid the danger which impended.

To be sure, the plaintiff gave deposition testimony that the car he observed stopped in the intersection was the vehicle with which he came into collision and was, so he "assumed," the car of the defendant. That testimony, aided by the inferences of the Keirn evidence, would have sufficed for the lookout instruction Taylor contends the court erroneously withheld. The plaintiff, however, repudiated the deposition statements at the trial: "[I]f I said that I didn't mean to say that." The positive testimony, affirmed and reaffirmed, that the only car in the intersection throughout the approach eastward was a car other than the Vega and that the Keirn vehicle was never in the view of the plaintiff until the moment of impact, conclusively binds Taylor to a theo-

ry of recovery consistent with that testimony and denies him the benefit of inferences from the evidence of the defendant, contradicted and disavowed by the plaintiff. The court properly rejected the submissions of recovery tendered by the plaintiffs on the theory of the failure of lookout by the defendant.

The final point contends that cross-examination inquiry by the defendant of an economist witness was prejudicial and that the denial of mistrial to allay that prejudice was error. Taylor was employed by TWA as a mechanic. He claimed disability from that work continuously since the collision and injury on October of 1977. There was evidence that the plaintiff suffered prior maladies, among them: diverticulosis, osteoarthritis, diabetes and emphysema. He contended that those conditions did not disable him from the usual occupation. There was other evidence that the plaintiff suffered subsequent bodily injury from a collision in June of 1978. The plaintiff testified that he was on continued medical leave as provided under the terms of a contract between the union and employer TWA on account of the October, 1977 collision. The plaintiff claimed the injury to the back and the aggravated osteoarthritis from that event caused permanent disability from work. To prove the economic value of that loss, the plaintiff presented economist Ward. That calculus of damage rested on the personal data given by Taylor as well as the definition of benefits due an employee under the union contract with employer TWA. The formal contract was tendered into evidence by the plaintiff without qualification, and received. On the basis of information given by Taylor interpolated into the terms of the union contract, economist Ward calculated the total economic loss to the plaintiff husband at some $200,000 and to the plaintiff wife at some $13,000.

In the course of cross-examination, counsel for defendant asked witness Ward: "You took into account his disability benefits that he's receiving from TWA?" Counsel for the plaintiff objected to the question as irrelevant and immaterial. Counsel pressed objection on grounds also that the cross-examination violated an admonition by the court against an inquiry—without prior leave—as to the receipt of such benefits and, further, that the question violated the collateral source rule. The plaintiff moved for mistrial. The court sustained objection to the question, but refused mistrial. On appeal, the plaintiff relinquishes the collateral source rule contention as a basis of trial error and asserts only that the cross-examination on a subject interdicted by the court was a defiance which not only compromised the judicial function, but was unfair to the plaintiff, an error fully redressed only by the sanction of mistrial.

■ The premises of argument are not valid. The "judicial admonition" the plaintiff posits as the basis for relief was not an incident of the trial we review, but of an earlier proceeding discontinued by mistrial. In that case, the motion in limine of the plaintiff sought the instruction of the court that the defendant make no inquiry before the jury as to medical disability benefits payable to Taylor by the terms of the union contract with the employer TWA. The plaintiff, as the basis for the rule, contended that the collateral source principle prevented evidence of the contractual benefits to reduce damages. The defendant disputed the operation of the collateral source rule where the benefit was a contractual right, and not a gratuity. The court received the contract as an exhibit for the purpose of determination of that contention. The counsel argued the effect of the collateral source rule on the evidence to be adduced, then only hypothetical. The court responded with tentative rulings, neither admonitory nor peremptory. In any event, whatever the temper of those orders, they are neither res judicata to the subsequent trial anew, nor did the parties otherwise agree to such an effect. *Smith v. Smith*, 176 S.W.2d 647, 649[3] (Mo.App.1944); *Dierman v. Bemis Bros. Bag Co.*, 144 Mo.App. 474, 129 S.W. 229, 230 (1910).

■ Another reason precludes the contention on appeal: the contract which economist Ward considered to calculate the eco-

nomic loss of the plaintiffs was tendered into evidence without reservation. That evidence then went to the jury room with the acquiescence of the plaintiffs. Thus, the inquiry of the defendant to witness Ward [however otherwise circumscribed by the collateral source rule—an issue not on appeal] was as to the content of an exhibit subject to exploitation as lawful evidence. *Iseminger v. Holden*, 544 S.W.2d 550, 554[4, 5] (Mo. banc 1976). The motion for mistrial was properly refused.

The judgment is affirmed.

All concur.