Jackie D. HOLLIS, Plaintiff–Respondent,

v.

Barbara Ann (Brewer) BLEVINS,
Defendant,

Dixie Prough, Public Administrator and
Defendant Ad Litem for George C. Van-
pool, Deceased, Defendant–Appellant,

**State Farm Mutual Automobile
Insurance Co., Defendant–
Appellant.**

Nos. 19864, 19877.

Missouri Court of Appeals,
Southern District,
Division One.

July 24, 1996.

Motion for Rehearing and Transfer
Denied Aug. 13, 1996.

Application to Transfer Denied
Sept. 17, 1996.

Wendell W. Crow, Crow, Reynolds, Preyer, Shetley & McVey, Kennett, for appellant George C. VanPool, Deceased by Dixie Prough, defendant ad litem.

Jeffrey S. Maguire, Thomasson, Gilbert, Cook, Remley and Maguire, Cape Girardeau, for appellant State Farm Mut. Auto. Ins. Co.

Dennis P. Wilson, Parsons, Wilson & Satterfield, P.C., Dexter, for respondent.

GEORGE M. FLANIGAN, Senior Judge.

On July 6, 1992, a collision occurred at the intersection of U.S. 60 and Route DD in Butler County involving a 1976 Ford LTD four-door sedan and a 1990 Pontiac Grand Am four-door sedan. The driver of the Ford was George VanPool. The Ford was owned by plaintiff Jackie Hollis who was riding in it as a passenger. The Pontiac was driven by Barbara Brewer who was accompanied by a passenger, Keith Blevins.

At the scene, Highway 60 is a two-lane highway which runs east and west and is 24 feet wide. The north shoulder of Highway 60 is 6 feet 5 inches wide and the south shoulder is 10 feet 6 inches wide. Route DD runs north and south at the intersection and has concrete curbs which end at the shoulders of U.S. 60. The distance between the east curb and the west curb of Route DD, south of Highway 60, is 177 feet 10 inches. There is a concrete island approximately in the middle of Route DD south of the intersection and a similar island north of Highway 60. The speed limit was 55 mph.

Prior to the collision, a 1986 Chevrolet pickup truck, driven by Floyd Ross, was stopped in the westbound lane of U.S. 60 waiting for eastbound traffic to clear before turning south on Route DD. The eastbound Ford approached the intersection in the south lane of U.S. 60 and the westbound Pontiac approached the intersection in the north lane. Preceding the Pontiac was a westbound pickup truck, the driver of which was never identified. This opinion will refer to that vehicle as the Doe pickup.

As the Doe pickup approached the stopped Chevrolet, it turned to the right and passed the Chevrolet on the north shoulder. As the Pontiac approached the stopped Chevrolet, the Pontiac moved into the south or eastbound lane of U.S. 60. The Ford, which at all times was in its own, the eastbound, lane laid down 31 feet of skid marks before colliding with the Pontiac a short distance east of the rear of the Chevrolet. The impact occurred at or near the south edge of the eastbound lane.

Following the collision George "Bud" Van-Pool died. Plaintiff Hollis brought this action for personal injuries and property damage against defendants Barbara Brewer, Dixie Prough (defendant ad litem for Van-Pool), and State Farm Mutual Automobile Insurance Company. The petition alleged that the collision was caused by the negligence of Barbara Brewer, VanPool, and the operator of the Doe pickup. Plaintiff's claim against State Farm, under the uninsured motorist provisions of the policy covering plaintiff's Ford, was based on the movements of the Doe pickup.

The jury assessed percentages of fault as follows:

| | |
|---|---|
| Operator of John Doe pickup (State Farm) | 2% |
| Defendant Barbara Blevins | 95% |
| Decedent George VanPool | 3% |
| Plaintiff Jackie Hollis | 0%. |

The jury found the damages of plaintiff Hollis to be as follows:

| | |
|---|---|
| Property Damage | $ 1,500.00 |
| For Hospital, Medical, Surgical and Dental Care furnished by the Veterans Administration | 46,841.00 |
| For all other damages for personal injury | 100,000.00 |
| Total Damages | $148,341.00. |

The court entered judgment in favor of plaintiff Hollis and against defendants Blevins and Prough, jointly and severally, in the sum of $148,341.00. On the separate count against State Farm, the court found that the uninsured motorist coverage provided by the policy was limited to $25,000.00 and entered judgment in favor of Hollis and against State Farm in the sum of $25,000.00. Defendant Brewer did not appeal. Appeals were filed by VanPool's defendant ad litem and State Farm. The appeals will be dealt with separately.

### No. 19877—Appeal of Dixie Prough, Defendant Ad Litem for George VanPool, Deceased

Appellant asserts that plaintiff failed to make a submissible case against appellant's decedent and that Instruction 9, plaintiff's verdict director against appellant, was not supported by the evidence. This point is valid and it is unnecessary to consider appellant's other points.

Instruction 9 told the jury it must assess a percentage of fault to VanPool if it believed:

(1) VanPool knew or by the use of the highest degree of care could have known that there was a reasonable likelihood of collision in time thereafter to have slackened his speed or swerved but VanPool failed to do so;

(2) VanPool was thereby negligent; and

(3) Such negligence directly caused or directly contributed to cause damage to plaintiff.

All the witnesses were called by plaintiff. Their testimony included the following:

#### *Floyd Ross:*

I stopped my Chevrolet pickup truck a little ways back from the middle of the intersection, heading west on Highway 60. I was going to make a left turn onto DD. I had my left turn signal on. I waited for the Ford coming east. I saw the Doe pickup and the Pontiac in my rearview mirror. I saw the vehicles behind me some 300 yards and the Ford coming to meet me was about the same distance. I was watching the vehicles behind me to see what they were going to do. The Doe pickup was five to six car lengths behind me when it went off the road to go around me. At that time, the Pontiac was five to six car lengths behind the Doe pickup. At that time, the Ford was no more than four car lengths in front of me. The Doe pickup drove on the shoulder and went on down the highway. The Doe pickup was not speeding. The Pontiac was not speeding. The Ford was going about the same speed, about the speed limit, as it was coming east. After the Doe pickup went around me, the Pontiac began to swerve over into the left lane. At that time, the Ford was pretty close to the front of my truck. The impact between the Ford and the Pontiac was to my left and even with my back bumper. The Doe pickup did not stop or come back to the scene. When the Doe pickup was side by side with me on the shoulder, the Pontiac was about four car lengths behind me. When the Doe pickup had cleared my front on the shoulder, the Pontiac was still behind me in my lane of traffic. The Pontiac had not moved either direction when the Doe pickup cleared me.

The Pontiac was three to four car lengths behind me before she took evasive action, when she swerved to the left. There was nothing to prevent the Pontiac from going to the right. The Doe pickup had cleared that area. When the Pontiac went into the left lane, the Ford was right at my front bumper. At the time of the impact the front of the Pontiac was at least on the shoulder. From the time that the Pontiac swerved over into the other lane, it was just about instantaneous that they ran together. The Ford was in its proper lane of travel until it reached the intersection.

### Keith Blevins:

I was a passenger in the right front seat of the Pontiac. I did not see any vehicles in the westbound lane in front of the Doe pickup. As we approached the intersection, the Doe pickup slammed on its brakes. It did not have any brake lights. The first time I saw the Chevrolet sitting there at the intersection was when the Doe pickup swerved off the road. The Pontiac was four to five car lengths from the Doe pickup when it moved off the highway. The Doe pickup barely missed the Chevrolet. In order to avoid the Chevrolet, the Doe pickup swerved around to the right onto the shoulder. When the Doe pickup started slowing down, we started approaching it fast. We could tell he was stopping and we thought we were going to hit him and he let off his brakes and jerked out and went around the Chevrolet. We had nowhere to go. Barbara went to the left trying to get into the ditch. The Pontiac went into the eastbound traffic lane and across it. As the Pontiac approached the intersection, we were doing the speed limit or a little less. The speed of the Doe pickup was probably 50. We were slowly coming up on it. Before the Ford got to the intersection I think he was going more like to the right. The Ford was in his own lane for a second then swerved to the right. The Pontiac went directly across the eastbound lane. The damage to the Pontiac was on the right front and down the right hand side back toward the door where I was. The impact occurred to the right side of the Ford about where the skid marks end. The Pontiac was almost all the way off the road. The Pontiac

was two to three car lengths behind the Chevrolet when Barbara decided to go across the road. When I saw the Doe pickup brake, it was still on the pavement. I felt Barbara react by braking the Pontiac. At the time of the impact between the Pontiac and the Ford, there was room between the Pontiac and the Chevrolet for the Ford to have gone on through. There was room in the eastbound lane for the Ford to have cleared without contacting either vehicle.

### Corporal L.L. Bell, Missouri Highway Patrol:

I investigated the accident. When I arrived at the scene, the Ford and the Pontiac were still where they had come to rest after the impact. The Ford was still in the eastbound lane just slightly east of Route DD. The Ford left skid marks which were 31 feet long. The Ford was located just past the end of the skid marks and was pointed off toward the south shoulder. There was debris where the vehicles had come together and the debris was located barely in the eastbound lane, right next to the edge of the pavement. The impact involved the right front of the Ford and the right front of the Pontiac. At impact the Pontiac was angled across the lane. Ross told me about the Doe pickup which had gone around him on the right side. When I made my official report, I included a notation about that. I was not able to identify the driver of the Doe pickup.

### Barbara Brewer:

Before the accident I saw the Doe pickup truck a quarter of a mile or a half mile from my vehicle. My speed was 55 and I was gaining on the Doe pickup slightly. The Doe pickup was going 45 or 50. I was four or five car lengths behind the Doe pickup when I got to 10 car lengths or so from the intersection where the accident occurred. I did not see any signal lights on the Doe pickup or any turn signals. I saw no brake lights on it. I saw no change in its speed. It swerved to the right and went off to the north shoulder. It was a sudden movement of the Doe pickup. After it moved off the traveled part of the road, I saw the Chevrolet stopped in the road. When I first saw the Chevrolet, I was

at least two car lengths from it, wherever the Doe pickup went off the side. I was very close to the Chevrolet. When I saw the Doe pickup move off the right side of the road, I went to the left side of the road. I don't recall any signal lights or turn signals on the Chevrolet. Prior to the time I started to the left I did not see any eastbound vehicle. When I first saw the Ford, it was right where I was, very shortly before impact. I was off the traveled part of the roadway. I cannot say my entire vehicle was off the traveled part. When I swerved to go to the south, I had slowed up a little but I don't know my speed. I recall hitting the brakes slightly and then swerving. As I was traveling across the eastbound lane of Highway 60 I don't know if I was slowing down or not. I could not have stopped short without hitting the Chevrolet. I was about two car lengths behind the Chevrolet when I saw it and I swerved just as soon as I saw it. It was a clear day. There was room between my vehicle and the Chevrolet for the Ford to have cleared without hitting my vehicle. My best judgment as to how to avoid the accident was to hit the ditch on the other side. I had no time to think about that decision. The damage to my car was to the right front quarter and right front end at about the right door. The damage to the Ford was across the front end, about the center over on the right.

### Jackie D. Hollis:

Bud VanPool and I were in my 1976 Ford LTD. Bud wanted me to set the cruise control and I set it at 53. As we approached the intersection, I saw the Chevrolet. Bud said, "That [Chevrolet] is going to pull right out in front of me," and I said, "Bud, the [Chevrolet] is stopped and he's got his turn signal on. He's waiting for us."[1] When I saw the Pontiac, it was just coming normal—I never thought a second thing about it. I was watching the Chevrolet to see what Bud was concerned about but everything was going smooth. At that time we had closed to 150, 200, 250, or 300 yards. I could see the

Pontiac still coming. The Pontiac was then 250, 300 yards from the back of the Chevrolet. I forgot about the Pontiac. I caught a glance out of the corner of my eye by this time something was going to happen. I could tell that the Pontiac was coming and I kept watching. From then on, I didn't take my eye off the Pontiac. I was concerned about the way the Pontiac was going up and down, the way the car was floating. It was speeding. I told Bud, "Bud, that car is not slowing down." At that time we were about 100 yards from the Chevrolet. The cruise control was still set and I never noticed any change in the speed of my vehicle. I wasn't paying no attention because I figured Bud would take care of this car. I was watching the Pontiac and I told Bud, "Bud, she has not broke, she is not breaking." I said, "If you don't do something quick we are going to see one heck of a wreck because she is going right up the back end of that pickup." When I said that, we were pretty close to the Chevrolet, 150, 200 feet at the most. After I made that statement, she made her move and came across and I hollered at Bud. I said, "Bud, she is going to get us instead," and that's when the impact occurred. At the time I told Bud something was going to happen,[2] that we weren't going to be able to stop, there was still room for Bud to pull the vehicle off the road at that point onto the shoulder. I did not feel the cruise control being released at any time before Bud hit the brakes to start sliding just before the impact. Before the accident my car was in A-one condition, good mechanical condition. At no time did I see any vehicle between the Pontiac and the Chevrolet. I had no obstructions to my view. The road is flat, straight, and level. Bud was driving in the proper lane of traffic. If you touch the brakes on my car, the cruise control goes off. I was not over 150 to 200 feet from the Chevrolet when I told Bud she is not going to slow down and if she didn't, she was going to go up the back end of the Chevrolet. I don't know whether or not at that time Bud had applied his brakes or swerved. I yelled at Bud to ditch

---

1. No party objected to plaintiff's testimony concerning his conversation with his deceased driver.

2. The record does not show when this statement was made or the respective positions of the vehicles at that time.

it. I don't know whether Bud swerved or changed the direction of the Ford before the collision. After I hollered for him to ditch it, it was too late. In my deposition I said Bud was 100 percent clear of fault and I told Bud's wife that Bud was not at fault. When the Pontiac was 300 yards from the intersection, we were 300 feet from it. I don't know how fast the Pontiac was going. I never saw any other vehicle between the Pontiac and the Chevrolet. The fault was not Bud's but he could have been more defensive. He could have drove a little more defensive and possibly stopped it all and I could have too. At the moment of impact, the Pontiac was in our lane of traffic, totally across our lane.

■ An issue submitted by an instruction must be supported by the evidence. *Oldaker v. Peters*, 817 S.W.2d 245, 251[7] (Mo. banc 1991). Appellate review of the sufficiency of the evidence to support the giving of an instruction is made in the light most favorable to its submission, and if the instruction is supportable by any theory, its submission is proper. *Id.* at 251–252[8]. The evidence and inferences therefrom are viewed most favorably to the party offering the instruction and all contrary evidence and inferences are disregarded. *Id.* at 252.

■ Negligence is ordinarily an issue for the jury to decide. *Kuehle v. Patrick*, 646 S.W.2d 845, 847[3] (Mo.App.1982). Determination of whether the evidence is sufficient to submit the issue to a jury is a legal question and not a matter of judicial discretion. *Kuehle* at 847[4]; *Meyer v. Lanning*, 620 S.W.2d 34, 35 (Mo.App.1981). The trial court may not take the case from the jury unless the evidence is so strongly against plaintiff as to leave no room for reasonable minds to differ on the issues submitted. *Kuehle* at 847[5]; *Gregory v. Robinson*, 338 S.W.2d 88, 91 (Mo.banc 1960).

■ "A motorist has a duty to stop, swerve, slacken speed or sound a warning when he or she knows or by the exercise of the highest degree of care could have known that there was a reasonable likelihood of collision in sufficient time to take such preventive measures." *McHaffie v. Bunch*, 891 S.W.2d 822, 828[6] (Mo.banc 1995). If rea-

sonable minds could differ as to when a driver knew or could have known of a reasonable likelihood of collision, the question of when the duty arises to take evasive action is for the jury. *Id.* at 828[7]. A driver has a duty to keep a careful lookout for approaching vehicles with sufficient care to appreciate and apprehend the danger of going on without taking precautionary measures. *Id.* at 828[8].

■ Each element of a verdict directing instruction must be supported by substantial evidence. *Frazier v. Emerson Electric Company*, 867 S.W.2d 700, 702[4] (Mo. App.1993). The giving of MAI 17.04 is proper only where there is evidence that the driver had sufficient time, distance, means, and ability, considering the movement and speeds of the vehicles, to stop or swerve to avoid the collision but failed to do so. *Id.* at 702[6]. A driver who has time to stop also has time to swerve. *Id.* at 702; *Ethridge v. Gallagher*, 773 S.W.2d 207, 212 (Mo.App. 1989).

■ MAI 17.04 submits defendant's ability to realize an accident could occur in sufficient time to swerve. To submit failure to swerve, plaintiff has to show when the potential danger of collision should have become actually or constructively apparent to defendant and to show defendant had sufficient time thereafter to swerve or to take other effective precautionary action. *Morgan v. Toomey*, 719 S.W.2d 129, 133 (Mo. App.1986). Under MAI 17.04, the duty to swerve arises when defendant knew or should have known the collision would likely occur. Defendant breaches this duty if, thereafter, he had the time, distance, means, and ability to avoid the collision by swerving and he failed to do so. *Morgan* at 136[11]. Having the ability to avoid a collision means not only having necessary mechanical appliances but also having sufficient time and distance to take effective action. *Saupe v. Kertz*, 523 S.W.2d 826, 830[4, 5] (Mo.banc 1975); *Gardner v. Reynolds*, 775 S.W.2d 173, 178[9] (Mo.App.1989).

Courts have judicially noted that the average reaction time of a motorist is ¾ second. *Burns v. Maxwell*, 418 S.W.2d 138, 141 (Mo.

1967); *Smiley v. Farmers Ins. Co., Inc.,* 749 S.W.2d 711, 712 (Mo.App.1988). "[Appellate courts] cannot judicially note the exact distance it takes a specific automobile to stop when driven at a specific speed on a dry concrete highway...." *McCarthy v. Wulff,* 452 S.W.2d 164, 168–169[9] (Mo.1970). In *Wulff* the court judicially noted that an automobile driven at 50–55 miles per hour could have stopped within 350 to 400 feet.

■ In *Hecker v. Schwartz,* 426 S.W.2d 22 (Mo.1968), the plaintiff was a passenger in a northbound vehicle which collided with a southbound vehicle in the northbound lane of the highway. The southbound vehicle crossed into the northbound lane. The court said that under those circumstances the driver of the northbound vehicle was under no duty to reduce his speed or to swerve or to take other evasive action until he knew or by the exercise of the highest degree of care could have known that there was a reasonable likelihood of collision.

"*Hecker* holds, consistently with principle, that a duty to swerve [or to take other evasive action] does not arise until the motorist knows or should know that a likelihood of collision exists absent precaution—and that in the case of oncoming traffic that duty does not arise until likelihood that the opposite vehicle will invade the wrong side of the roadway."

*Taylor v. Keirn,* 622 S.W.2d 778, 782 (Mo. App.1981).

In *Leek v. Dillard,* 304 S.W.2d 60, 68[19] (Mo.App.1957) this court said:

"[I]t is a principle in the law of negligence recognizing that, where a motorist is confronted with a sudden emergency, not created in whole or in part by his own negligence, he should not be held to the same accuracy of judgment as would be required if he had time for calm deliberation and that, if he exercises such care as a very careful and prudent person would have exercised under the same circumstances, he should not be convicted for an error in judgment or miscalculation as to space, even though it might appear subsequently

that a wiser and safer course could have been pursued."

■ This court holds that the evidence was insufficient to support the giving of Instruction 9. VanPool had no duty to take evasive action to avoid colliding with the Pontiac until he knew or should have known that such a collision was reasonably likely to occur.

According to Ross, the Pontiac began to swerve into the left lane when it was three to four car lengths behind the Chevrolet. At that time the Ford was right at the Chevrolet's front bumper. The Ford laid down thirty-one feet of skid marks. VanPool was already applying the brakes when the Pontiac began to swerve. VanPool began taking evasive measures before the Pontiac swerved or entered the eastbound lane. The fact that the Pontiac swerved to the left without hitting the Chevrolet shows that it could have swerved to the right without hitting the Chevrolet.

Blevins said the Pontiac was two to three car lengths behind the Chevrolet when the Pontiac swerved. He also said the Ford swerved to the right before it got to the intersection.

Barbara Brewer said she was about two car lengths behind the Chevrolet when she swerved. She also said that when she first saw the Ford it "was right where I was shortly before the impact." This, too, shows that VanPool was taking evasive measures before the Pontiac swerved.

Plaintiff said the Ford was 150 to 200 feet from the Chevrolet when plaintiff told VanPool that the Pontiac was going up the back end of the Chevrolet. Plaintiff did not know whether, at that time, VanPool had already swerved or applied his brakes. Plaintiff never saw the Doe pickup.[3] Later, when plaintiff told VanPool to "ditch it," it was too late.

Plaintiff offered no specific evidence as to the swerving capabilities, in terms of distances and time periods, of the Ford. A vehicle moving at 53 miles per hour moves at

---

**3.** Plaintiff may not properly claim that the Doe pickup was not present. His trial theory, and submission against State Farm, was based on its presence. Whether the Doe pickup restricted VanPool's view of the Pontiac is open to speculation.

77.73 feet per second. Absent slackening of speed, the Ford would travel 150 feet in 1.93 seconds and 200 feet in 2.57 seconds. VanPool applied his brakes and laid down 31 feet of skid marks. This effort to avoid the collision required reaction time of ¾ second plus the unmeasured time it took to lay down the skid marks. To say that VanPool had a duty to take earlier action, by slowing or swerving, so as to avoid the collision is to resort to speculation.

This was not a "near miss" or "almost escaping" situation. Photographs show that the impact involved the right front of the Pontiac and the right front of the Ford. The rear half of the Pontiac was still in the eastbound lane at time of impact. Plaintiff's argument that the Ford had room in the eastbound lane to have gone on through without contacting the Pontiac or the Chevrolet is inconsistent with his argument (and submission) that VanPool was negligent in not slowing or swerving earlier than he did.

The portion of the judgment in favor of plaintiff and against appellant Dixie Prough, Public Administrator and Defendant Ad Litem for George C. VanPool, Deceased, is reversed.

### No. 19864—Appeal of State Farm

State Farm's first point is that the trial court erred in denying its motion for a directed verdict and in giving Instruction 11, plaintiff's verdict director against State Farm because: (a) Instruction 11 was not supported by substantial evidence in that plaintiff failed to prove that the operator of the Doe pickup suddenly slowed the vehicle without giving an adequate and timely warning of his intention to slow, and that this caused or directly contributed to cause the accident, and (b) Plaintiff failed to make a submissible case against the operator of the Doe pickup in that any action of the uninsured motorist was not the proximate cause of the accident.

Instruction 11 required the jury to assess a percentage of fault to the operator of the Doe pickup if the jury believed: (1) Either, the operator of the Doe pickup moved the vehicle to the right upon a roadway to pass a stopped vehicle without signaling an intention to do so, or, the operator of the Doe pickup suddenly slowed the vehicle on the highway without first giving an adequate and timely warning of his intention to slow, and (2) The operator of the Doe pickup, in any one or more of the respects submitted [in (1) ], was thereby negligent, and (3) Such negligence directly caused or directly contributed to cause damage to plaintiff, and (4) A policy providing uninsured motorist coverage for plaintiff existed at the time of the occurrence.

Instruction 11 also defined the phrase "uninsured motor vehicle." State Farm concedes that the Doe pickup meets that definition.

State Farm argues: No one testified that the Doe pickup suddenly slowed or that there was ever a danger of Barbara Brewer driving into the back of the Doe pickup because it had suddenly slowed. The witnesses simply agreed that the uninsured motorist, when he came up behind the Chevrolet, swerved to the right and went around the Chevrolet on the right. There was no testimony from which it could be found that the application of brakes, even if the uninsured motorist applied his brakes, caused the accident. This is shown by the testimony of Barbara Brewer who said that she did not see the Doe pickup suddenly slow and did not notice any change in speed. She swerved to the left because it had gone to the right. Her swerving to the left had nothing to do with the "sudden slowing" of the Doe pickup. Barbara Brewer did not have any right to follow the Doe pickup at a speed which left her incapable of responding to emergencies on the road ahead of her. She had no right to run into the rear of the Doe pickup and she had no right to run into the rear of the Chevrolet. The emergency which was created by her sudden recognition of the presence of the Chevrolet was simply not legally the fault of the uninsured motorist. The actions of the uninsured motorist which were submitted to the jury, namely, slowing or turning without giving an adequate signal, were not causal because Barbara Brewer did not have to swerve to miss the Doe pickup. He was gone. The uninsured motorist had no duty to warn and there was no causation involved

in the charges of negligence which were submitted to the jury.

For the reasons which follow this court rejects that argument.

No person shall stop or suddenly decrease the speed of or turn a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided herein.

§ 304.019, RSMo 1994.

■ Keith Blevins testified that the Doe pickup slammed on its brakes as the Doe pickup and the Pontiac approached the intersection. He said the Doe pickup jerked out and went around the Chevrolet. Blevins did not see any brake lights or signal lights on the Doe pickup. Blevins did not see the Chevrolet until the Doe pickup had swerved off Highway 60. The Doe pickup barely missed the Chevrolet.

Barbara Brewer testified that the Doe pickup made a sudden movement in going off onto the north shoulder. She saw no signal lights or turn signals or brake lights on the Doe pickup. After the Doe pickup moved off the traveled portion of Highway 60, she saw the stopped Chevrolet. She testified she was about two car lengths behind the Chevrolet when she first saw it and she swerved just as soon as she saw it.

Plaintiff argues that the testimony of Keith Blevins and Barbara Brewer supports the assignments of negligence submitted in Instruction 11 with respect to the operator of the Doe pickup. Plaintiff argues that it would be reasonably foreseeable to the driver of the Doe pickup that the Pontiac, which was following closely behind the Doe pickup, would be placed in a position of peril from collision if the Doe pickup suddenly without warning checked its speed or swerved, leaving the driver of the Pontiac to face almost certain collision with the rear of the Doe pickup or the Chevrolet or the Ford.

No party to this appeal has challenged the fact that Barbara Brewer was guilty of negligence in the operation of the Pontiac. This court holds that the testimony of Barbara Brewer and Keith Blevins was sufficient to support the giving of Instruction 11 with respect to the negligence of the operator of the Doe pickup and its causal connection with plaintiff's injuries. According to those witnesses, the operator of the Doe pickup suddenly slowed that vehicle and swerved it to the right and did so without giving any signal, timely or otherwise. If a timely signal had been given, so the jury could find, Barbara Brewer would have learned of the presence of the Chevrolet earlier than she did, and her swerve to the left would not have been made. The evidence supported the giving of Instruction 11. *Mayer v. Burnett*, 433 S.W.2d 546 (Mo.1968); *Hawthorne v. Hills*, 861 S.W.2d 337, 340–341, 342; *Bowman v. Moore*, 237 Mo.App. 1163, 167 S.W.2d 675, 679–680[3–8] (1942). Appellant's first point has no merit.

State Farm's second point is that the trial court erred "in submitting the claim against Defendant State Farm for the reason that plaintiff failed to prove that he complied with the notice provision of the State Farm policy (Exhibit 32) which requires that the person making a claim shall report a 'phantom vehicle' accident to the police within 24 hours and to [State Farm] within 30 days."

A sufficient answer to this point is that it lacks factual support. The brief of State Farm in this court states: "The presence of [the Doe pickup] was reported to the Trooper, as well as to State Farm, but it was never reported that this vehicle or the operator had any causal connection with the accident, or was negligent."

Corporal Bell included information about the Doe pickup in his official report. Barbara Brewer testified that she talked to a State Farm representative within thirty days after the accident and informed him of the Doe pickup and its movements. Keith Blevins testified that he talked with the State Farm representative within fourteen days after the accident and informed him of the Doe pickup and its movements. Barbara Brewer testified that she was insured by State Farm at the time the accident happened.

By agreement of counsel the testimony of Barbara Brewer and Keith Blevins concerning the issue of notice was given outside the

presence of the jury. Also outside the presence of the jury, counsel for plaintiff and for State Farm "stipulated that on the notice question the only notice that State Farm received from plaintiff Hollis or his attorneys concerning a claim or claims made as a result of this accident within thirty days of the accident is represented by a letter from plaintiff's attorney to [State Farm] dated July 25, 1992."

Counsel for State Farm offered that letter as an exhibit. It is not in the record on appeal and it is not mentioned in State Farm's brief. The statement of facts portion of State Farm's brief makes no mention of the notice provision of the policy or any fact pertaining to its compliance or noncompliance.

In *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7 (Mo.banc 1995), the insured sued to recover uninsured motorist benefits under his automobile insurance policy after he was injured in an accident purportedly caused by a "phantom vehicle." The trial court entered summary judgment for the insurer on grounds that the insured had failed to comply with the policy's notice provision. In reversing and remanding the Supreme Court held that genuine issues of material fact existed which precluded the entry of a summary judgment. At pages 15–16 the Court said:

> Substantial compliance with a policy's notice requirement is sufficient, and a failure to comply in some immaterial respect does not justify the avoidance of liability on the part of the insurer. In determining whether or not an insured was in substantial compliance with a policy's notice provision, the trier of fact must consider whether the insurance company was prejudiced by the delay. Furthermore, the burden of proving such prejudice is on the insurer, and the presence or absence of prejudice in this context is an issue of fact to be determined on the particular facts of each case. [authorities omitted]

The record shows that State Farm received notice. Even if there had been noncompliance with the notice provision, State Farm has made no showing that it was preju-

diced. State Farm's second point has no merit.

State Farm's third point reads: "The court erred in entering judgment against State Farm in the amount of $25,000.00 for the reason that the jury found against the uninsured motorist for only two percent of the liability in this auto accident."

Plaintiff's "State Farm Car Policy" contained "Uninsured Motor Vehicle—Coverage U" with a limit of liability of $25,000.00 for "each person." State Farm concedes that the Doe pickup was an uninsured motor vehicle.

Coverage U reads in pertinent part: "We will pay damages for bodily injury an insured is legally entitled to collect from the owner or driver of an uninsured motor vehicle. The bodily injury must be caused by accident arising out of the operation, maintenance or use of an uninsured motor vehicle."

State Farm argues: "[T]he only portion of the fault assessed in this case which Plaintiff is 'legally entitled to recover' from the uninsured motorist, is the two percent (2%), and not the limit[ ] of $25,000.00. The Court erred in entering Judgment against State Farm in the amount of $25,000.00, and should have entered Judgment against State Farm in the product of two percent (2%) multiplied by the verdict, or $2,966.82."

The right of the injured party to recover from an uninsured motorist carrier arises from the insurance contract rather than in tort. *Automobile Club Inter–Insurance Exchange v. Farmers Insurance Co.*, 646 S.W.2d 838, 840 (Mo.App.1982). An insured has no obligation to assert a tort claim against the tort-feasor prior to filing suit against his uninsured motorist carrier. *Schreiner v. Omaha Indemnity Co.*, 854 S.W.2d 542, 544[5] (Mo.App.1993). To similar effect see *Oates v. Safeco Insurance Company of America*, 583 S.W.2d 713 (Mo.banc 1979).

One purpose of the uninsured motorist statute, § 379.203, is to establish a level of protection equivalent to liability coverage an insured would have received if the insured had been involved in an accident with an insured tort-feasor. *Wilson v. American Standard Ins. Co.*, 792 S.W.2d 669, 671 (Mo.App.1990).

"In all tort actions for damages, in which fault is not assessed to the plaintiff, the defendants shall be jointly and severally liable for the amount of the judgment rendered against such defendants." § 537.067.1. If the driver of the Doe pickup had been made a party defendant, the jury verdict assessing a two percent (2%) percentage of fault to him would not prevent the plaintiff, to whom no fault was assessed, from collecting the full amount of the judgment, $148,341.00, from that driver.

The bodily injury portion of the judgment was $146,841.00. Under Coverage U State Farm's limit of liability was $25,000.00. Because plaintiff was legally entitled to collect from the driver of the Doe pickup $146,841.00 for bodily injury, the trial court properly entered a judgment in the amount of $25,000.00 in favor of plaintiff and against State Farm under Coverage U. State Farm's third point has no merit.

State Farm's fourth point is that the trial court erred in giving Instruction 14 and in giving the verdict form because they deviated from MAI and unduly highlighted the damages consisting of the medical care provided by the Veterans Administration; further, the charges asserted by the Veterans Administration were not shown to be for medical care that was made necessary by this accident and the charges were not shown to be reasonable in amount.

"Recovery for medical expenses incurred as a result of a defendant's negligence in a personal injury action depends upon proof of the necessity and reasonableness of the medical expenses incurred." *Hagedorn v. Adams*, 854 S.W.2d 470, 477[18–19] (Mo. App.1993). To similar effect see *Schaeffer v. Craden*, 800 S.W.2d 165, 166 (Mo.App.1990).

Instruction 14 reads:

In these instructions you are told to itemize any damages you determine by the categories set forth in the verdict form.

The phrase 'hospital, medical, surgical and dental care furnished by the Veterans Ad-

ministration' means the reasonable cost of such care which was either:

Provided in a facility operated by the Veterans Administration, or Provided in a non-Veterans Administration facility and paid for by the Veterans Administration.

The damages portion of the verdict form is set forth in the seventh paragraph of this opinion. It includes an item of $46,841.00 "for hospital, medical, surgical and dental care furnished by the Veterans Administration."

Plaintiff was hospitalized at a VA hospital in Poplar Bluff on the day of the accident and was transferred the next day to a VA hospital in St. Louis where he remained a patient until July 28, 1992. He was retransferred to Poplar Bluff and was hospitalized there until August 5, 1992, when he was admitted to Crowley Ridge Care Center, a nursing home, where he remained a patient until January 2, 1993.

Plaintiff introduced directives issued by the Department of Veteran Affairs for the fiscal years 1992 and 1993 setting forth the "tortiously liable billing rates." Plaintiff's Exhibit 16 was a "VA Billing Summary" for the charges incurred at each of the facilities. The services received included in-patient services totalling 36 days of which 29 days were surgical care. Charges for the nursing home services were for 148 days of skilled nursing.

Plaintiff's injuries included: right olecranon fracture, left humeral neck fracture, right and left patellar fractures, contusion of the chest, Le Fort II fracture, a right Hemi–Le Fort I fracture and nasal bone fracture. Each of these injuries required surgery. An attending physician testified that plaintiff's hospitalization "was directly related to his injury and overcoming his injuries."

Plaintiff's Exhibit 16 listed the various charges, based on government rates, for the care received by plaintiff as an inpatient, outpatient and a nursing home resident. These amounts total $46,819.82.[4] Exhibit 16 was passed to the jury. It included invoices of the Veterans Administration itemizing the various charges.

---

4. No party mentions the $30.18 variance between the total shown on Exhibit 16 and the figure contained in the verdict.

Some courts have held that charges made by the United States for medical care and treatment furnished plaintiff by the United States, determined as a result of action of the Director of the Bureau of the Budget pursuant to executive order, are not subject to challenge that they are unreasonable. *Phillips v. Trame,* 252 F.Supp. 948, 951[3] (E.D.Ill.1966); *Petersen v. Head Construction Co.,* 367 F.Supp. 1072, 1080[16] (D.C. 1973); *see, generally,* 7 ALR Fed 289 (1971) [Validity and Construction of Medical Care Recovery Act (42 U.S.C. §§ 2651–2653), Dealing with Third–Party Liability for Hospital and Medical Care Furnished by United States.]

■ As discussed under State Farm's third point, State Farm's limit of liability under Coverage U is $25,000.00 for "each person." The jury awarded plaintiff $146,-841.00 for bodily injury. Of that amount $46,841.00 was for medical care furnished by the Veterans Administration and $100,000.00 was for "all other damages for personal injury." State Farm has not challenged the $100,000.00 portion of the award. That portion alone is a sufficient basis for entering judgment against State Farm in the amount of $25,000.00. Even if, which need not be decided, State Farm's challenges to Instruction 14 and the Veterans Administration component of the verdict form are valid, State Farm was not prejudiced by the error. "No appellate court shall reverse any judgment unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action." Rule 84.13(b), V.A.M.R.

This court holds that the trial court did not commit prejudicial error against State Farm in the giving of Instruction 14 in the verdict form.

The portion of the judgment awarding plaintiff $25,000.00 against State Farm is affirmed.

MONTGOMERY, P.J., and GARRISON, J., concur.