**Madonna J. WILLIAMS, Respondent,**

v.

**Arthur S. DAUS, M.D., Appellant.**

**No. 25065.**

Missouri Court of Appeals,
Southern District,
En Banc.

July 30, 2003.

Motion for Rehearing or Transfer Denied Aug. 21, 2003.

Application for Transfer Denied Sept. 30, 2003.

Charles H. Stitt, Gregory P. Forney, Shaffer Lombardo Shurin, Kansas City, for appellant.

William H. Pickett, David T. Greis, William H. Pickett, P.C., Kansas City, for respondent.

ROBERT S. BARNEY, Judge.

Dr. Arthur S. Daus ("Appellant") appeals from a jury verdict against him based on medical negligence related to two surgeries performed on Madonna J. Williams ("Respondent"). Appellant asserts five points of trial court error. The first three points essentially claim that Respondent failed to make a submissible case on some of the categories of damages awarded to Respondent. In Point IV, Appellant contends the trial court erred in denying his motion for mistrial after a juror acquired and related to jurors extra-judicial evidence which prejudiced Appellant. Lastly, in Point V, Appellant contends that the trial court erred in submitting a verdict director that failed to submit the ultimate facts necessary for a verdict in favor of Respondent.

The record shows that Respondent had a history of back trouble, including a bulging disk in the lumbar spine. In June of

1987, she complained of back discomfort and visited with Dr. Gregory Unruh, who later diagnosed her with lumbar strain. Between her initial visit and January of 1991, Respondent visited Dr. Unruh several more times regarding complaints of various injuries to her back and neck in the course of various household activities.

In March of 1991, Respondent complained of several days of severe back spasms caused by lifting at her employment. Dr. Unruh directed her to perform only light duties at work, but the following month Respondent once again complained of a work-related back injury which left her unable to get out of bed. Dr. Unruh directed her to stay off work for six to eight weeks, but by May of 1991 Respondent complained that the back pain continued to worsen, had progressed down her left thigh, and that she was unable to sleep or walk. This condition had not improved by August of 1991, and Respondent has not returned to work since.

In August of 1991, Appellant performed his first surgery on Respondent for nerve root compression. A cerebral spinal fluid leak subsequently was discovered which required a second surgery to correct the leak and remove additional bone. Respondent also developed a cyst after the surgery that caused her additional pain.

Respondent continued to experience persistent and considerable pain in her back and legs since the two surgeries, and eventually brought suit against Appellant for medical negligence.

At trial, Respondent presented testimony from medical experts regarding her history of back problems, the two back surgeries that took place in 1991, opinions on whether the surgery for nerve root compression was necessary, and evidence relating to Respondent's post-operative condition. She also testified regarding her pain and back troubles experienced both prior to and following the surgeries performed by Appellant.

Additional expert testimony provided an actuarial projection of the economic impact of her resulting condition after her surgeries, together with estimates of Respondent's lost income and lost household services, based upon her present medical condition and inability to return to work.

The jury returned a verdict against Appellant, and awarded Respondent $1 million in total damages: $200,000 for past economic and medical damages; $200,000 for past non-economic damages; $200,000 for future medical damages; $200,000 for future non-medical economic damages; and $200,000 for future non-economic damages. The trial court entered judgment consistent with this award, and denied Appellant's motions for judgment notwithstanding the verdict ("JNOV"), remittitur, and a new trial.

In Point I, Appellant contends the trial court should have granted JNOV regarding economic and medical damages because Respondent failed to establish what portion of her injuries were attributed to Appellant's conduct. Appellant argues that Respondent had a pre-existing and debilitating condition, and that the evidence did not establish with a reasonable degree of medical certainty what portion of her present injuries resulted from the surgery and what portion was due to her prior condition.

▐ A trial court should sustain a motion for judgment notwithstanding the verdict "only when all of the evidence and the reasonable inferences to be drawn therefrom are so strong against the plaintiff's case that there is no room for reasonable minds to differ." *Poloski v. Wal-Mart Stores, Inc.*, 68 S.W.3d 445, 448 (Mo. App.2001). To survive this motion, a plaintiff must have made a submissible

case, which occurs when the plaintiff has presented substantial evidence for every fact essential to liability. *Id.* at 448. " 'Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide the case.' " *Id.* (quoting *Love v. Hardee's Food Sys., Inc.,* 16 S.W.3d 739, 742 (Mo.App.2000)). On appeal, we view all evidence in the light most favorable to the prevailing party and disregard evidence and inferences that conflict with the verdict. *Butts v. Express Personnel Services,* 73 S.W.3d 825, 835 (Mo.App. 2002). We can only reverse the trial court's decision on appeal when there is a complete absence of probative facts to support the verdict. *Id.* " 'A judgment notwithstanding the verdict is a drastic action, and it should only be granted when reasonable persons could not differ on a correct disposition of the case.' " *Id.* (quoting *Coggins v. Laclede Gas Co.,* 37 S.W.3d 335, 339 (Mo.App.2000)).

'The elements of a claim for medical malpractice are: 1) an act or omission by the defendant that failed to meet the requisite medical standard of care, 2) negligent performance of that act or omission, and 3) a causal connection between the act or omission and the plaintiff's injury.' *Wuerz v. Huffaker,* 42 S.W.3d 652, 655–56 (Mo.App.2001) (quoting *Yoos v. Jewish Hosp.,* 645 S.W.2d 177, 183 (Mo.App. 1982)). "The nature of [Appellant's] duty to [Respondent] under the circumstances of this case must be established by expert medical testimony [and,] [o]nce the duty is established, whether [Respondent] was negligent under the evidence becomes a jury question." *Lashmet v. McQueary,* 954 S.W.2d 546, 551 (Mo.App.1997). "[I]f any one of [Respondent's] experts was qualified to testify to the standard of care and that the breach caused injury to the [Respondent], then [Respondent] has made

a submissible case and it was error to set aside the judgment." *Brooks v. SSM Health Care,* 73 S.W.3d 686, 692–93 (Mo. App.2002).

 " 'Absolute certainty is not required in proving a causal connection between a negligent defendant's actions and the plaintiff's injury.' " *Butts,* 73 S.W.3d at 837 (quoting *Coggins,* 37 S.W.3d at 339). A submissible case is made if substantial evidence is presented that shows the injury is a natural and probable consequence of a defendant's negligence. *Id.* A jury also may infer causation from the circumstances of the case. *Id.* If the evidence leads to the logical conclusion that " 'if certain things had been properly done certain results would not have occurred, and such results did occur, the evidence of causation is sufficient.' " *Id.* (quoting *Parris v. Uni Med, Inc.,* 861 S.W.2d 694, 697 (Mo.App.1993)). "A causal connection is often established by showing facts and circumstances which 'fairly suggest' negligence as the proximate cause in light of ordinary circumstances." *Id.* Absent compelling evidence which establishes the absence of causation, the causation question is for the jury. *Butts,* 73 S.W.3d at 837.

 When viewing the facts in the light most favorable to the verdict and disregarding all unfavorable evidence, we find substantial evidence upon which the trial court could find that Respondent made a submissible case that Appellant's conduct was the "but for" cause of her increased pain, economic damages, and medical damages.

The record shows that, prior to the surgery, Respondent experienced ongoing low back pain and other symptoms which several physicians diagnosed as a lumbosacral strain. However, expert testimony also indicated that Respondent's lumbosacral strain was treatable and that such injuries

generally heal over time and without the need for surgery. Dr. Watts testified that:

Q: Doctor, people who have lumbosacral strains, do they heal on their own?

A: [Dr. Watts]: The vast majority of them do, yes, sir.

Q: Can some end up with minimal but permanent disability?

A: Some can.

Q: Can one have a lumbar strain that's more severe and then you heal, but you have a greater disability, but you can still work?

A: Some people can heal to the point where they can go back to work, but then they still have chronic, nagging problems, which they work through.

Dr. Watts added that the best course of action for a lumbosacral strain is to let it heal with time:

Q: How do [lumbosacral strains or sprains] heal?

A: They heal with time just like any bruise … it just takes time for the body to heal, just like a bruise would take.

* * *

[W]e know that the best way to allow these things to heal is just rest them and let Mother Nature deal with them. Mother Nature's pretty good at that.

Dr. Abrams expressed a similar opinion:

Q: When you have a sprain, does one heal over time in the sprained area?

A: [Dr. Abrams]: Generally speaking, yes.

Dr. Unruh also affirmed that such injuries generally recover from disabling lumbosacral strains:

Q: Doctor, with time, people get over lumbosacral strains that temporarily disable them normally, do they not?

A: As a general rule.

Q: Doctor, do people usually get over lumbosacral strains that are disabling them when it's in the acute time frame?

A: As a general rule.

Dr. Unruh also acknowledged that patients with such a condition remain able to continue working and remain active in the community.

Q: Are you aware, Doctor, of your patient population that has a chronic lumbosacral strain that are still out working and doing things in the community?

A: Yes, sir.

Contrary to the findings of other physicians which diagnosed Respondent with lumbosacral strain, Appellant diagnosed Respondent with nerve root compression and recommended surgery. From what we can glean from the record, Dr. Daus performed a laminectomy on L4, L5 and S1, which removed portions of bone from Respondent's spine, and also a foraminotomy on L5 and S1, which required cutting into various points of the facet joints of the spine and removing portions of the nerve roots at L4, L5, and S1.

However, expert testimony showed that none of the classic "indications"—i.e. signals which revealed nerve root compression—were present in Respondent's medical records, and therefore the surgery performed by Appellant was not necessary.

Dr. Watts testified that "there are well-established indications for surgery when there is nerve root compression." He explained these indications may be exhibited by abnormalities in muscle function, radicular pain and radiculopathy neuropathy. Additionally, nerve root compression may be implicated by evidence of a ruptured disc, disc herniation, neuroforaminal encroachment, or spinal canal stenosis.

The record shows that, prior to the surgery, Respondent exhibited none of these

classic indications which could signify nerve root compression. Dr. Watts stated that, after reviewing Respondent's medical records, surgery should not have been performed on Respondent. Dr. Watts also noted that Appellant diagnosed Respondent with a "foraminal stenosis L5–S1 on the left" in a pre-operation diagnosis, but Dr. Watts acknowledged that no clinical or imaging indications supported that diagnosis and that the radiologist did not indicate foraminal stenosis in his report, nor did the x-rays or films of Respondent's spinal area indicate nerve root compression. Dr. Abrams acknowledged that Dr. Unruh and three other physicians diagnosed Respondent as having only a lumbar strain, and made no notation of an abnormal neurological finding. Dr. Watts acknowledged that, absent indications of compression from a patient's history, physical, or imaging, "you certainly don't think about operating." He also testified that in these circumstances "it was inappropriate to offer surgery on [Respondent], let alone do it" and that the recommendation for surgery and the decision to perform that surgery was below the standard of care.

Expert testimony also showed that the surgeries caused Respondent's condition to worsen with a resulting increase in pain. Dr. Watts testified, to a reasonable degree of medical certainty, that a spinal fluid leak occurred after the first surgery, which necessitated a second corrective surgery to repair the leak. Dr. Abrams and Dr. Lennard acknowledged that this spinal fluid leak likely resulted from the first surgical procedure, during which the dura apparently was torn or incised and not patched. As a result of that leak, Respondent experienced spinal headaches and increased pain. Dr. Abrams also testified that, to a reasonable degree of medical certainty, a cyst developed over the S2 vertebral body near a point of incision during the first surgery, which pressured the spinal nerves and further contributed to Respondent's post-operative pain. Respondent also had scarring from the first surgery. Dr. Watts and Dr. Lennard explained that a second surgery was performed on Respondent, during which Appellant repaired the spinal fluid leak, removed the cyst, made additional cuts to remove a greater portion of the L3 lamina, and extended the laminectomy at L4 and L5 and the foraminotomy at L4, L5, and S1.

Dr. Watts added that the surgeries also led to more headaches, an increase in instability and more chronic back pain, and additional symptoms on her right side not previously present. Dr. Watts opined that as a result Respondent was "in worse condition post-operatively than she was before the first operation" and also that "as a result of this surgery, she was not improved." Dr. Watts further testified that Respondent's back pain worsened and became intractable after the surgeries. Dr. Unruh similarly opined, based upon a reasonable degree of medical certainty and probability, that he felt Respondent was in a worse overall condition than before the surgery.

Dr. Abrams testified, to a reasonable degree of medical certainty, that Respondent had "residual low back pain" and leg pains due to the surgery. Dr. Abrams also testified that Respondent's condition worsened after each surgery and that "I think that that stamps the surgical intervention as the precipitating cause of her pain." Dr. Adams acknowledged that but for the surgery, Respondent would not have any scarring and fibrosis.

Finally, Appellant's own expert witness, Dr. Lennard, was asked the following questions by Respondent's attorney during cross-examination:

Q: And the surgery most certainly contributed to her disability, now, didn't it?

A: It did affect the impairment rating, yes.

Q: I mean, lumbar strains usually you don't go to 20 percent, now, do you?

A: No.

Q: Matter of fact, you're lucky if you say five, isn't that true?

A: That's correct, yes.

\* \* \*

Q: Because of all the problems in surgery, isn't that true, Doctor?

A: It's because of the surgical procedure, what was done, yes.

Such testimony provides submissible evidence upon which a jury could reasonably conclude that Appellant's conduct caused Respondent's injuries and that she suffered discernible physical impairment as a result of Appellant's conduct.

The record also evidences that Respondent suffered economic and medical damages due to her worsened post-operative condition.

Expert testimony showed that Respondent was *no longer capable of continuing in her former employment.* Dr. Unruh acknowledged, based on a reasonable degree of medical certainty and probability, that Respondent was permanently disabled after the surgery and that she will never be capable of doing what she did prior to the first surgery due to her disability. Dr. Unruh explained that while Respondent was once disabled but still functioning, she is now disabled due to intractable pain.[1] Dr. Abrams testified that Respondent was no longer capable of functioning in any meaningful capacity to make a living, other than extremely sedentary activities.

Respondent also presented evidence regarding the economic and medical costs associated with her post-operative condition. Dr. Abrams testified that Respondent's condition would require quarterly examinations, lab work, and ongoing pain medication prescriptions. Dr. Adams estimated that this treatment could cost about $100 per quarterly examination and a minimum of $300 per month in pain medication.

■ Dr. John Ward, an economist, also provided actuarial projections of Respondent's total economic loss, based on the $4.05 per hour earned just prior to her injury and the estimated value of the household services she could no longer perform. Dr. Ward testified, to a reasonable degree of economic certainty, that Respondent's losses could reach as much as $355,382. While Appellant contends that Dr. Ward's calculations did not account for her pre-existing condition, the jury could rely upon medical testimony and evidence offered by Dr. Lennard and other experts to determine what an appropriate percentage of damages could be attributed to the surgeries. Furthermore, even if as Appellant contends Dr. Ward's estimates were somewhat questionable, "absolute certainty in predicting future damages is not required." *Long v. Missouri Delta Medical Center,* 33 S.W.3d 629, 640 (Mo.App.2000).

■ Appellant also contends that Respondent failed to present expert testimony "to a reasonable degree of certainty" which established that his conduct caused Respondent's economic and medical damages or which established the true measure of damages resulting from his conduct. We disagree.

---

1. The testimony indicates that Respondent distinguished a disability caused by a chronic lumosacral strain, which generally permitted patients to continue working and remaining active in the community, from the more debilitating disability experienced by a patient who remained in intractable pain.

■ As previously discussed, throughout her questioning of expert witnesses Respondent solicited opinions based on "a reasonable degree of medical certainty." Respondent also inquired if Dr. Ward's actuarial projection on the economic losses was based on a reasonable degree of economic certainty. We further note that "the precise words used by an expert witness do not necessarily 'render his testimony inadmissible if he intended to express his opinion or judgment.'" *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 125 (Mo. banc 1995) (quoting *Lineberry v. Shull*, 695 S.W.2d 132, 136 (Mo.App. 1985)). In our review of the record, we determine that Respondent's expert witnesses intended to express their respective opinions and/or judgments regarding Respondent's physical condition, both prior to and after her surgeries, despite the fact that they did not always use the assertedly talismanic phrase, within a "reasonable degree of medical certainty." *Id.; see also Stevens v. Craft*, 956 S.W.2d 351, 354 (Mo. App.1997); *Kilmer v. Browning*, 806 S.W.2d 75, 81–82 (Mo.App.1991)

■ Furthermore, Appellant points to no instance at trial where he presented a specific objection to Respondent's failure to use the phrase "within a reasonable degree of medical certainty" when soliciting testimony from an expert medical witness. By failing to offer a specific objection at trial or during deposition[2], Appellant deprived Respondent of the opportunity to rephrase her questions in the form that he now demands on appeal. *See Bynote*, 891 S.W.2d at 125; *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 210 (Mo. banc 1991);[3] *see also Hemeyer v. Wilson*, 59 S.W.3d 574, 581 (Mo.App. 2001); *Graham v. County Medical Equipment Co.*, 24 S.W.3d 145, 149 (Mo. App.2000). Moreover, Appellant "failed to question [Respondent's experts'] degree of certainty on cross-examination, the proper forum for raising the doubts it now brings up on appeal." *Bynote*, 891 S.W.2d at 125; *see Miller v. Weber*, 688 S.W.2d 389, 391–92 (Mo.App.1985). Accordingly, we must find that Appellant waived this contention.

We cannot find that the trial court erred in denying Appellant's request for JNOV. Respondent presented sufficient evidence that Appellant's conduct was the cause of her injuries and the resulting economic and medical damages attributable to that conduct. Point I is denied.

In Point II, Appellant contends the trial court erred when it submitted an instruction and verdict director which defined and allowed recovery for Respondent's lost earnings, lost earnings capacity, and future medical expenses. Appellant argues that Respondent failed to present submissible evidence that these damages were caused by Appellant's conduct. We disagree.

■ Every instruction must be supported by sufficient evidence, and "every element of a verdict director must be supported by substantial evidence." *Vintila*

---

2. The record indicates that Dr. Unruh and Dr. Abrams were not present at trial, and that portions of their deposition testimony were read or played on videotape.

3. Regarding deposition testimony, the Supreme Court ruled in *Seabaugh* that a defendant who failed to object to expert testimony that plaintiff's injuries were "more likely" or "probable" to worsen instead of to within "a reasonable degree of medical certainty" waived a speculation objection at trial. The Court explained that had the objection to the question or answer been made during the deposition, the plaintiff's counsel would have had the opportunity to rephrase, clarify, or lay a better foundation for the question. *Seabaugh*, 816 S.W.2d 202, 210 (Mo. banc 1991). We find that situation analogous to that presently before us.

*v. Drassen,* 52 S.W.3d 28, 40 (Mo.App. 2001). " 'Appellate review of the sufficiency of the evidence to support the giving of the instruction is made in the light most favorable to its submission, and if the instruction is supportable by any theory, its submission is proper.' " *Id.* (quoting *Hollis v. Blevins,* 927 S.W.2d 558, 564 (Mo. App.1996)). Our determination regarding whether sufficient evidence exists to submit the issue to the jury is a legal question and not a matter of judicial discretion. *Id.*

■■■ As previously set out at length in Point I, we find that, when viewed in the light most favorable to the submission of the instruction and verdict director, submissible evidence existed regarding the issues of causation and Respondent's economic and medical damages. Therefore, the court did not err in its decision to submit an instruction and verdict director based on that claim. Point II is denied.

In Point III, Appellant contends that the trial court erred in admitting Dr. John Ward's testimony regarding Respondent's lost earnings and lost earnings capacity because Respondent failed to present submissible evidence that Appellant caused the loss.

We note that this claim of error relates to substantially the same issues as those presented in Points I and II. As discussed in those points, we find that submissible evidence existed on that issue to support the finding of damages attributable to Appellant. Therefore, Dr. Ward's testimony was properly admitted by the trial court. Point III is denied.

In his fourth point on appeal, Appellant contends that the trial court erred in not granting his motion for new trial based on purported misconduct of a juror in acquiring extra-judicial evidence relevant to the case. In particular, he posits that during the course of trial a juror visited Appellant's place of employment, either solicited or overheard comments regarding his medical insurance and prior malpractice claims against him, and then related that information to other jurors during deliberation. Appellant argues that this information concerned the issue of negligence developed at trial and prejudiced Appellant in that it indicated he was medically incompetent.

■■■ "The general rule in Missouri is that a juror's testimony about jury misconduct allegedly affecting deliberations may not be used to impeach the jury's verdict." *Travis v. Stone,* 66 S.W.3d 1, 4 (Mo. banc 2002). "[P]recedents of this state are legion which recite the rule that 'the affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury' of which the juror was a member." *Neighbors v. Wolfson,* 926 S.W.2d 35, 37 (Mo.App.1996) (quoting *Smugala v. Campana,* 404 S.W.2d 713, 717 (Mo.1966)). Generally, "jurors may only speak through their verdict ... [and] cannot speak of any partiality or misconduct that transpired in the jury room nor of the motives which induced or operated to produce the verdict." *State v. Taylor,* 917 S.W.2d 222, 225 (Mo.App.1996). "[A] juror's testimony or affidavit may not be used to impeach the verdict as to misconduct inside or outside the jury room whether before or after the jury is discharged." *Stotts v. Meyer,* 822 S.W.2d 887, 888–89 (Mo.App.1991). This "firmly entrenched rule in Missouri is [known as] the *Mansfield* rule." *Kemp v. Burlington Northern R.R. Co.,* 930 S.W.2d 10, 13 (Mo. App.1996). "[T]his is true whether the juror concurred in or dissented from the verdict." *Reed v. Sale Mem. Hosp. and Clinic,* 741 S.W.2d 819, 824 (Mo.App.1987); *see also Wingate v. Lester E. Cox Med. Ctr.,* 853 S.W.2d 912, 916 (Mo. banc 1993);

*Smugala,* 404 S.W.2d at 717, together with cases cited in *Stotts,* 822 S.W.2d at 889.

> 'No one is competent to impeach a verdict as to matters inherent in the verdict, such as that the juror did not understand the law as contained in the court's instructions, or that he voted a certain way due to a misconception of the evidence, or misunderstood the statements of a witness, or other matters "resting alone in the juror's breast." '

*McCormack v. Capital Elec. Const. Co.,* 35 S.W.3d 410, 414 (Mo.App.2000) (quoting *Maxam v. Dillon,* 674 S.W.2d 258, 260 (Mo.App.1984)); *see also William Carver Co., v. Poos Bros., Inc.,* 778 S.W.2d 684, 688 (Mo.App.1989).

■ Courts recognize an exception to this general rule, however, and allow a party to attack a verdict on the ground that juror misconduct occurred outside the courtroom, such as when a juror gathers evidence extraneous to the trial. *See Travis,* 66 S.W.3d at 4. That is to say that the juror testimony must allege:

> that extrinsic evidentiary facts (i.e., facts bearing on trial issues but not properly introduced at trial) were interjected into the jury's deliberations, [and not merely allege] that jurors acted on improper motives, reasoning, beliefs or mental operations (the latter type of juror testimony is said to concern 'matters inherent in the verdict.'). Extrinsic evidentiary facts enter a jury's deliberations when, for example a juror visits an accident scene without the court's authorization and then shares his observations with his fellow jurors.

*Neighbors,* 926 S.W.2d at 37 (citations omitted) (quoting *Baumle,* 420 S.W.2d at 348); *Stotts,* 822 S.W.2d at 889–91; *see also Douglass v. Missouri Cafeteria, Inc.,* 532 S.W.2d 811, 813 (Mo.App.1975); *Thorn*

*v. Cross,* 201 S.W.2d 492, 497 (Mo.App. 1947).

■ "Even where the purpose of testimony regarding the misconduct (whether it occurred inside or outside the jury room) is to impeach the verdict, the party complaining of the testimony must make a timely and proper objection or else the issue is waived." *Travis,* 66 S.W.3d at 4; *see also Neighbors,* 926 S.W.2d at 37; *Thorn,* 201 S.W.2d at 497; *accord Edley v. O'Brien,* 918 S.W.2d 898, 906 (Mo.App. 1996) (citation omitted). ("A juror's testimony or affidavit is inadmissible to impeach a verdict. However, no objection was made to the affidavit tendered to the trial court. When parties fail to object to the admissibility of an affidavit submitted for that purpose, it may be considered."); *Shearin v. Fletcher/Mayo/Associates,* 687 S.W.2d 198, 203 (Mo.App.1984); *Hale v. American Family Mut. Ins. Co.,* 927 S.W.2d 522, 528, n. 1 (Mo.App.1996) ("Affidavits and testimony of jurors are generally inadmissible to impeach a verdict. The inadmissibility of such evidence may, however, be waived by its receipt without objection.") (citation omitted).

■ "A motion for new trial, based on a juror's acquisition of extraneous evidence, is left to the sound discretion of the trial court." *Travis,* 66 S.W.3d at 3; *Collins v. Hertenstein,* 90 S.W.3d 87, 109 (Mo. App.2002); *see Baumle v. Smith,* 420 S.W.2d 341, 347 (Mo.1967). A trial court's ruling on a motion for new trial based on juror misconduct is given great weight, and the appellate court may reverse that ruling only "if it appears that the trial court abused its discretion in ruling on the issue of extraneous evidence or the issue of prejudice." *Travis,* 66 S.W.3d at 3; *see also Alcorn v. Union Pacific R.R. Co.,* 50 S.W.3d 226, 246 (Mo. banc 2001).

■ Abuse of discretion occurs "when the ruling offends the logic of the circum-

stances or was so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration." *Portis v. Greenhaw*, 38 S.W.3d 436, 443 (Mo.App.2001). "[I]f reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Anglim v. Missouri Pacific R.R. Co.*, 832 S.W.2d 298, 303 (Mo. banc 1992); *Richardson v. State Hwy. & Transp. Comm'n*, 863 S.W.2d 876, 881 (Mo. banc 1993).

In a motion for new trial based upon allegations of juror misconduct, the burden normally is upon the contesting party to show the misconduct and that the misconduct was prejudicial. *See Travis*, 66 S.W.3d at 3; *see Middleton v. Kansas City Public Serv. Co.*, 348 Mo. 107, 152 S.W.2d 154, 158 (1941). "Once it is established that a juror has gathered evidence extraneous to the trial, prejudice will ordinarily be presumed, and the burden is on the respondent in such a case to overcome the presumption of prejudice." *Travis*, 66 S.W.3d at 3. However, "even where juror testimony is competent to impeach a verdict, it is incumbent upon the trial judge to decide whether the juror misconduct complained of prejudiced the verdict." *Neighbors*, 926 S.W.2d at 38. Since "[t]his determination is vested in the discretion of the trial court [it is] reviewed under the abuse of discretion standard of review." *Id.; Baumle*, 420 S.W.2d at 347.

In his motion for new trial, Appellant presented the affidavit of one of the jurors, together with the testimony of four jurors, reciting that a juror gathered evidence extraneous to trial and then related that evidence to the four jurors during deliberations. *See* discussion herein.

The record shows that Respondent consistently posed a variety of objections, including hearsay and lack of foundation, to any affidavit or juror testimony which alleged juror misconduct. In the hearing below and now in this appeal, Respondent also argues that since her objections were timely and proper, the first condition— that the party in whose favor the verdict was returned acquiesced in the proposition that the juror is competent to give testimony—was not satisfied, and, therefore, the hearing court was precluded from considering Appellant's claim of jury misconduct. *See Neighbors*, 926 S.W.2d at 37; *Thorn*, 201 S.W.2d at 496–97 ("a verdict cannot be impeached by evidence or testimony of a juror, nevertheless, where such evidence is received without objection, the party who should have objected but fails to do so waives all right to complain against the court's consideration of such evidence and it is to be given its natural probative value."); *Taylor*, 917 S.W.2d at 225 (trial court not barred from considering evidence of juror misconduct when state failed to object); *Shearin*, 687 S.W.2d at 205 (finding it a firmly established rule in this jurisdiction that a juror may not impeach the verdict unless respondents fail to timely and properly object to the juror doing so);[4] *see also Travis*, 66 S.W.3d at 4.

We do note that in *State v. Stephens*, 88 S.W.3d 876 (Mo.App.2002), the Western District of this Court, in the context of a criminal trial, interpreted *Travis* to mean that evidence of misconduct occurring outside the jury room could be received into

---

4. *See also State ex rel. State Hwy. Comm'n v. Lock*, 643 S.W.2d 46, 49–50 (Mo.App.1982); *Norwood v. Lazarus*, 634 S.W.2d 584, 589 (Mo.App.1982); *State v. Suschank*, 595 S.W.2d 295, 298 (Mo.App.1979); *State v. Zweifel*, 570 S.W.2d 792, 795 (Mo.App.1978); *Gantz v. Leibovich*, 569 S.W.2d 373, 374 (Mo.App.1978); *Bailey v. Hilleman*, 566 S.W.2d 504, 506 (Mo.App.1978).

evidence, despite a timely and proper objection. *Id.* at 882–83. *Stephens* reasoned that *Travis* "did not intend to cut down the exception it had just recognized," *Id.* at 883, when it had previously set out that "the party complaining of the testimony must make a timely and proper objection or else the issue is waived," *Travis,* 66 S.W.3d at 4; *Stephens,* 88 S.W.3d at 882–83.

We gratuitously note, however, that while the *Travis* court recognized that it is permissible to elicit testimony about jury misconduct occurring outside the jury, such as the gathering of extrinsic evidence, it also reiterated, and gave express recognition to the well-settled proposition that where the purpose of testimony regarding the misconduct is to impeach the verdict, the party complaining of the testimony must make a timely and proper objection or else the issue is waived. *Travis,* 66 S.W.3d at 4. *Travis* did not expressly overrule the long line of cases supporting this foregoing proposition. *See Neighbors,* 926 S.W.2d at 37; *see also* concurring opinion of Dixon, J., in *Shearin,* 687 S.W.2d at 204–07, listing additional cases *in accord.*

However, we need not consider the arguments of the parties relative to whether the hearing court could even consider evidence of juror misconduct, where a proper objection to the receipt of the evidence by the hearing court had been lodged. The hearing court's denial of Appellant's motion for new trial is, nevertheless, supported by the record.

■■■ We determine in the first instance that Appellant failed to present any recognizable and relevant evidence of juror misconduct because of the hearsay nature of the jurors' testimony presented. *See Rodriguez v. Suzuki Motor Corp.,* 996 S.W.2d 47, 59 (Mo. banc 1999).[5] Alternatively, we infer the hearing court credibly determined that while the purported offending juror may have *told* jurors during deliberations that she visited the hospital in question, the hearing court concluded that she, in fact, never went there. Accordingly, the juror's remarks made during jury deliberation were in the nature of matters "inherent in the verdict," and could not be used to challenge the verdict rendered by the jury. *See Neighbors,* 926 S.W.2d at 37; *Williams Carver Co.,* 778 S.W.2d at 688.

We observe that in support of Appellant's allegation of juror misconduct, during the course of the hearing Appellant presented an affidavit of Juror Messer, followed by the testimony of Ms. Messer and three other jurors.[6] Respondent previously had filed a motion to strike the affidavit and objected to its use or to any testimony by any juror in person or by affidavit on the subjects raised by the affidavit. Respondent also made repeated motions to strike the testimony of all ju-

5. We observe that "[a] hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and which depends upon the veracity of the statement for its value." *Rodriguez,* 996 S.W.2d at 59. "Stated another way, evidence is hearsay only if its evidentiary value depends on drawing an inference from the truth of the statement." *Id.* "Furthermore, if the relevance of the statement lies in the mere fact that it was made, no reliance is placed on the truth of the statement or the credibility of the out-of-court declarant, and the statement is not hearsay."

*Id.* "Generally, courts exclude hearsay because the out-of-court statement is not subject to cross-examination, is not offered under oath, and is not subject to the fact finder's ability to judge demeanor at the time the statement is made." *Bynote,* 891 S.W.2d at 120.

6. During the hearing, the affidavit was used to refresh the recollection of Juror Messer. She testified the alleged offending juror was Juror No. 2.

rors on the basis of hearsay and lack of foundation. The trial court overruled these objections and received evidence of juror misconduct.[7]

Juror No. 2 was not present at the hearing, nor had she been subpoenaed to testify by Appellant, who had the burden of proof at the hearing. As a general rule, the neglect or failure by Appellant to summons Juror No. 2 to the hearing raised a strong presumption that her testimony was damaging and unfavorable to Appellant's contentions. *See Kelly v. Jackson,* 798 S.W.2d 699, 701 (Mo. banc 1990); *Simpson v. Johnson's Amoco Food Shop, Inc.,* 36 S.W.3d 775, 778 (Mo.App.2001); *Hailey v. Atchison, Topeka & Santa Fe Ry. Co.,* 579 S.W.2d 739, 743 (Mo.App. 1979). We may infer that had Juror No. 2 been called to testify, she would have denied visiting the hospital or overhearing any conversations concerning Appellant.[8]

The motion court made no formal findings of facts or conclusions of law, but did make the following observations from the bench:

Let me ask you this question: What if she [Juror No. 2]—as I am fairly convinced, *that she told the jury this, but it never happened?* What if she just decided that she thought the Plaintiff ought to get a settlement, ought to get some money out of this case and *that she told the other jurors this in a way to help influence them to see the case as she saw it, but it never happened.* (Emphasis added.)

Now, are we talking about deliberations of the jury that appear not to be able to be challenged by testimony of other jurors or are we talking about something else?

 The question that the hearing court had to answer was whether the offending juror relied on extrinsic evidence, i.e., conversations she overheard from nurses or had with nurses at the hospital, or whether the offending juror simply made up this story she told to the jury. If she did the latter, her statements made to jurors during deliberations would, at best,

7. Ms. Messer testified, in relevant part, that:

[Ms. Messer] A: She told us that Dr. Daus, if he had been sued one more time that he'd lose his license and that the money for the lawsuits that they have to pay for—the insurance, that he ran out of that money.
* * *
Q: Tell the court where she gathered this information.
A: She was by the nurses' station at Freeman Hospital.
* * *
Q: Yes, sir. Ms. Messer, did she indicate when in point of time this information—she had come by this information in relation to when the trial started?
* * *
A: She said it was during the trial, a couple of days before we had deliberated, she was at the hospital during the trial.
Mr. Blecha testified, in relevant part, that:
[Mr. Blecha] A: One of the jurors said that she had been talking to somebody at the hospital and that she had heard that if Dr.

Daus lost the case, that he would lose his malpractice insurance and that he wouldn't be able to practice as a physician anymore.
Ms. Bernagozzi's testimony, in relevant part, stated:
[Ms. Bernagozzi] A: She said that she was at Freeman Hospital and she overheard, I think, two nurses talking about the case and they said something to the effect that if Dr. Daus lost this case, he would lose his license. She overheard that.
Ms. Stuck's testimony, in relevant part, also stated:
[Ms. Stuck] A: The juror said that there were other pending lawsuits against the Doctor and that should he lose this one he was in jeopardy of loosing [sic] his license to practice.

8. Indeed, Appellant's trial counsel was of the same view when he announced to the motion court "[a]s for [Juror No. 2's] presence or non-presence, I think the Court can, if it wants, [sic] to assume that she would testify that she didn't do this."

be considered "matters inherent in the verdict" and be privileged. None of these statements could be used to impeach the verdict when an objection to their introduction was properly lodged, as it was in this case. *See Stotts,* 822 S.W.2d at 889; *Baumle,* 420 S.W.2d at 348; *Williams Carver Co.,* 778 S.W.2d at 688; *Maxam,* 674 S.W.2d at 260; *see also McCormack,* 35 S.W.3d at 414. The fact that "jurors acted on improper motives, reasoning, beliefs or mental operations [that is] matters inherent in the verdict," provide no grounds for attacking a verdict of the jury. *Neighbors,* 926 S.W.2d at 37. "Jury deliberation must be guarded to bring finality to the litigation process, and, in addition to the rule precluding a juror's testimony about the jury's deliberation, matters inherent in the verdict are not assailable by affidavit for the purpose of impeaching the verdict." *State ex rel. Hwy. & Transp. Comm'n. v. Pracht,* 801 S.W.2d 90, 93 (Mo. App.1990); *see also Wingate,* 853 S.W.2d at 916; *Smugala,* 404 S.W.2d at 717.

 When determining whether the trial court abused its discretion, " '[w]e indulge every reasonable inference in favor of the trial court's ruling.' " *McCormack,* 35 S.W.3d at 414 (quoting *McGraw v. Andes,* 978 S.W.2d 794, 802 (Mo.App. 1998)). In reviewing the denial of a motion for new trial, "matters such as 'the weight of the evidence, credibility of the witnesses and resolution of conflicts in the testimony' are not subject to our review.' "

*Smith v. Wal–Mart Stores, Inc.,* 967 S.W.2d 198, 208 (Mo.App.1998) (quoting *Miller v. Gillespie,* 853 S.W.2d 342, 344 (Mo.App.1993)). Furthermore, "[a] trial court's ruling on a motion for new trial is not required to set forth its reasons for the conclusion reached or the mental process by which the determination was made...." *McCormack,* 35 S.W.3d at 414.

 Based on the hearing court's remarks made during the hearing, concomitant with the fact that the hearing court overruled Appellant's motion for new trial, we discern that while the hearing court may have believed Juror No. 2 made the statements attributed to her, it was not convinced that the events she described actually occurred. While Juror No. 2 may have affected juror deliberations, we discern that her remarks consisted of matters inherent in the verdict, made in an attempt to sway the other jurors to her point of view. Under the circumstances presented, these statements made during the course of jury deliberations could not be used to challenge the verdict. *Neighbors,* 926 S.W.2d at 37–38.[9] We determine the trial court did not abuse its discretion in overruling and denying Appellant's motion for new trial on the basis of a finding of no juror misconduct. *Williams Carver Co.,* 778 S.W.2d at 688. Point IV is denied.

In Point V, Defendant contends the trial court erred in submitting a verdict director that allowed the jury to impose liability in the event that it found Appel-

**9.** We observe that in a court-tried case the court is accorded wide latitude in the admission of evidence, because it is presumed that it will not give weight to evidence that is incompetent. *Markley v. Edmiston,* 922 S.W.2d 87, 91 (Mo.App.1996). In our review of the record, we also discern that the testimony of the four jurors was presented for the express purpose of proving the truth of the matter purportedly asserted by Juror No. 2— that she went to the hospital and either over-

heard or talked with nurses at their station— and constituted inadmissible hearsay. *Rodriguez,* 996 S.W.2d at 59; *Bynote,* 891 S.W.2d at 120. Without this testimony there was no basis for a finding of juror misconduct.

We have consistently affirmed judgments, if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or insufficient. *Springfield Land and Dev. Co. v. Bass,* 48 S.W.3d 620, 631 (Mo.App.2001).

lant "performed a surgery without proper indications." Respondent now seeks a new trial on the grounds that the instruction was vague and uncertain in that it failed to advise the jury what ultimate facts were necessary to conclude that Appellant was negligent for performing the surgery.

" 'In reviewing the submissibility of an instruction, an appellate court views the evidence and reasonable inferences in the light most favorable to the instruction and disregards all contrary evidence.' " *Vintila*, 52 S.W.3d at 35 (quoting *Deckard v. O'Reilly Automotive, Inc.*, 31 S.W.3d 6, 18 (Mo.App.2000)). The error must be prejudicial, and the erroneous instruction must materially affect the merits of the action to be grounds for reversal on appeal. *Id.* The party challenging the submission of the instruction also must show that the offending instruction misdirected, misled, or confused the jury, or that the instruction affected the merits of the case. *Id; see also Butts,* 73 S.W.3d at 839. A trial court has the best opportunity to determine whether a jury instruction is confusing or misleading, and we shall not disturb that ruling absent an abuse of discretion. *Burns v. Elk River Ambulance, Inc.,* 55 S.W.3d 466, 478 (Mo.App. 2001); *Portis,* 38 S.W.3d at 445.

When reviewing jury instructions, "we must credit jurors with ordinary intelligence, common sense, and average understanding of the English language." *Burns,* 55 S.W.3d at 478. "[I]ssues relating to the weight, credibility, or the resolution of conflicts in testimony are matters for a jury's determination and are not matters for appellate review." *Lashmet v. McQueary,* 954 S.W.2d 546, 552 (Mo.App. 1997).

The use of Missouri Approved Instructions is mandatory in any case where the instructions apply; otherwise, the court may modify an existing MAI or draft a non-MAI. *Burns,* 55 S.W.3d at 477; Rule 70.02(b), Missouri Court Rules (1991). The instructions must submit to the jury "the ultimate facts required to sustain a verdict." *Stalcup v. Orthotic & Prosthetic Lab, Inc.,* 989 S.W.2d 654, 658 (Mo.App. 1999). " 'There are no precise, universally applicable definitions that explicitly differentiate evidentiary facts from ultimate facts.' " *Id.* (quoting *Duncan v. First State Bank,* 848 S.W.2d 566, 569 (Mo.App. 1993)). "Courts must determine ... what the ultimate facts are on a case-by-case basis." *Id.* "This determination involves analysis of the specific theory relied upon by the party offering the instruction." *Id.; Burns,* 55 S.W.3d at 478.

Appellant's claim of error relates to the verdict directing instruction submitted to the jury (Instruction No. 7) on the issue of negligence. That instruction set out:

Your verdict must be for the plaintiff Madonna J. Williams if you believe:

First, defendant Arthur S. Daus, M.D., performed a surgery without proper indications, and,

Second, defendant Arthur S. Daus, M.D., was thereby negligent, and

Third, such negligence either directly caused damage to plaintiff Madonna Williams or combined with her pre-existing back condition to directly cause damage to plaintiff Madonna Williams.

Appellant timely objected to the instruction at trial. He contended at trial and now in this appeal that the term "without proper indications," absent some definition of what specifically constitutes "proper" or an "indication" was overly vague, and failed to provide the jury any direction regarding what facts to consider to find him negligent. As a result, he

claims the instruction provided the jury with a "roving commission." [10]

Appellant cites to one case in support of his argument, *Grindstaff v. Tygett*, 655 S.W.2d 70 (Mo.App.1983), in which the first paragraph of the *Grindstaff* verdict director contained the language "defendant performed a midforceps rotation delivery when such procedure was not medically proper." *Id.* at 73. The *Grindstaff* court held that merely stating the procedure "was not medically proper" without including the acts or omissions complained of gave the jury no factual guidelines to determine negligence. *Id.; see Wilson v. Lockwood*, 711 S.W.2d 545, 553 (Mo.App. 1986).

However, we observe that the term "without proper indications" was given flesh and meaning during the course of trial. Dr. Watts testified that there are "well-established indications for surgery when there is nerve root compression." He explained these indications may be exhibited by abnormalities in muscle function; radicular pain and radiculopathy neuropathy. Additionally, nerve root compression may be implicated by evidence of a ruptured disc, disc herniation, neuroforaminal encroachment, or spinal canal stenosis.

Dr. Watts testified that a doctor should have indications of nerve root compression before surgery was appropriate. He testified that after reviewing Respondent's existing medical records, surgery should not have been performed on Respondent. Dr. Watts reasoned that the ensuing surgery was improper absent such indications.

This foregoing evidence gave meaning to the phrase "without proper indications."

To have hypothesized the different ways in which nerve root compression might be "indicated" to an examining physician would be precisely what Rule 70.02(b) condemns, i.e., giving of instructions that "require findings of detailed evidentiary facts." Rule 70.02(a), Missouri Court Rules (1991); *see Lashmet*, 954 S.W.2d at 553; *Spain v. Brown*, 811 S.W.2d 417, 420 (Mo.App.1991).

We observe that in *Kampe v. Colom*, 906 S.W.2d 796 (Mo.App.1995), an instruction directed the jury to find negligence if a doctor "failed to monitor the medications he prescribed for [a patient]." *Kampe*, 906 S.W.2d at 804. The doctor claimed that the instruction created a roving commission because it did not set forth the ultimate facts and thereby allowed multiple theories of recovery, and also because the term "monitor" did not have a commonly understood meaning. *Id.* at 804. However, the *Kampe* court found that the term was not a scientific word that required expert testimony to define, or required the jury to employ an expertise it lacked, or an infrequently used word, or a word of specific legal meaning that should be defined for the jury. *Id.* at 805. Rather, the court found that a reasonable person would interpret the instruction, when applied to the evidence presented in the case, to ask whether the jury found the doctor had "observed, oversaw, supervised, or regulated" the medication proscribed. *Id.*

In *Brooks v. SSM Health Care* we addressed an instruction which allowed a jury to find a doctor negligent if either he "administered [a drug] when it was not indicated by [the patient's] EKG, or in-

fused [the drug] at a rate which exceeded hospital guidelines. . . ." *Brooks,* 73 S.W.3d at 696. The doctor claimed that the instruction was too vague in that it failed to inform the jury what facts they must determine for negligence. However, we found that there was evidence presented regarding what EKG indications were necessary to administer the drug, and determined that there was evidence showing the doctor exceeded the hospital guidelines. We set out that it was for the jury to resolve the factual issues of whether the defendant exceeded the hospital's protocol when administering the drug. *Id.* at 696–97.

In *Burns,* a plaintiff brought a medical negligence claim against an emergency medical services (EMS) provider after her son experienced an asthma attack and stopped breathing en route to a hospital, where he eventually died. Among other claims, the plaintiff alleged that the EMS provider took too long to transport her son to the hospital and failed to establish and maintain an airway to provide oxygen to his lungs or administer drugs to aid breathing. *Burns,* 55 S.W.3d at 478–79. On appeal, the defendant argued that a jury instruction that contained the phrases "establishing a proper airway" and "transport in a timely manner" were too vague. *Id.* The defendant argued the word "proper" did not necessarily refer to a procedure or insertion of an artificial device, and "timely" and "adequate" required the jury to possess medical expertise to determine if the EMS provider performed its job correctly. *Id.* at 478. We found that a reasonable juror could understand such terms, and that the instruction did not require the jury to speculate or utilize medical expertise that it did not have. *Id.* at 479.

Similarly, in *Smith v. Kovac,* 927 S.W.2d 493 (Mo.App.1996), a doctor claimed that a jury received a roving commission when directed to find negligence if it found that he performed an "unnecessary hysterectomy." *Id.* at 498. The reviewing court determined that expert testimony had indicated that a hysterectomy was inappropriate and was a deviation from the accepted standards of medical care. *Id.* at 499. The reviewing court reasoned that from this testimony, the jury could find that the doctor had a duty not to perform the hysterectomy, and as a result the plaintiff's negligence theory was supported by the evidence, and the instruction was properly submitted. *Id.*

Based on our analysis of the evidence peculiar to this case, we cannot say that the jury instruction was vague, confusing, or otherwise failed to advise the jury that they could find for the Respondent only if they determined Appellant had performed surgery without proper indications, as discussed at trial. The instruction did not authorize the jury to find for Respondent on facts different from those presented at trial. *Spain,* 811 S.W.2d at 420–21. The trial court initially passed on the instruction and allowed it to be presented to the jury. We find no abuse of discretion in the trial court's actions. *See Burns,* 55 S.W.3d at 478. Respondent's instruction was supported by substantial and competent evidence adduced during trial. Point V is denied.

The judgment is affirmed.

PREWITT, P.J., Concurs.

PARRISH, J., Dissents and Concurs in dissenting opinion of MONTGOMERY, J.

SHRUM, J., Concurs in separate opinion.

MONTGOMERY, P.J., Dissents in separate opinion.

GARRISON, J., Concurs in dissenting opinion of MONTGOMERY, J.

RAHMEYER, C.J., Concurs in the principal opinion and the concurring opinion of SHRUM, J.

KENNETH W. SHRUM, Judge, concurring.

I concur in the affirmance of the trial court's judgment. I write separately regarding the jury misconduct issue and the submissibility question.

First, I respectfully suggest that to accept the dissent's analysis of the jury misconduct claim would expand the scope of *Travis v. Stone*, 66 S.W.3d 1 (Mo.banc 2002), and *State v. Stephens*, 88 S.W.3d 876 (Mo.App.2002), beyond permissible limits and establish a previously unrecognized exception to the hearsay rule in juror misconduct cases.[1] This is shown by the dissent's assertion that the "relevance of Juror No. 2's statement lies in the mere fact that she brought into the jury room outside information not offered in trial[ ]" and by its conclusion that it "cannot find that the four jurors gave hearsay testimony." As I understand it, the dissent deems the jurors' testimony admissible because of the presumptive *effect* of Juror No. 2's comments upon the state of mind of other jurors. In doing so, the dissent fails to recognize that (1) the ultimate dispositive fact issue was whether Juror No. 2 *actually* gathered extrinsic evidence. *Stephens,*

88 S.W.3d at 883, and (2) "even if relevant, hearsay evidence is inadmissible." *State v. Mease,* 842 S.W.2d 98, 110 (Mo.banc 1992).[2]

The *Travis* court, 66 S.W.3d at 4, cites with approval *Stotts v. Meyer,* 822 S.W.2d 887 (Mo.App.1991), for the proposition that "it is permissible to elicit testimony about juror misconduct that occurred outside the jury room, such as the alleged gathering of extrinsic evidence at issue here." In my view, however, that statement does not give rise to a special rule for juror misconduct cases which allows jurors to testify about what an allegedly errant fellow juror told them regarding his or her activity in gathering extrinsic evidence. I believe that neither *Travis* nor *Stotts* stands for such a proposition. To the contrary, *Stotts* makes it clear that such evidence *is not* competent or admissible to provide juror misconduct.

In *Stotts,* the jury misconduct allegation was that, during deliberations, several jurors visited an accident scene. One juror, Flippo, testified at a post-trial hearing on appellant's request for a new trial. The new trial motion was denied, and an appeal followed. On appeal, the *Stotts* court confined its review to the evidence adduced via juror Flippo, explaining:

"Counsel learned about the *misconduct of several other jurors* through Juror Flippo. Juror Flippo's affidavit reveals

---

**1.** Unlike this case, neither *Travis* nor *Stephens* involved hearsay evidence issues. In *Travis,* the evidence of juror misconduct was presented by the testimony of the juror who actually gathered the extrinsic evidence; consequently, no hearsay question existed. In *Stephens,* the misconduct issue arose because the prosecutor wrote a letter to defense counsel advising that a juror, during a recess, had visited the park where the victim had regained consciousness. Moreover, *Stephens* was decided upon prejudice grounds. As such, evidentiary issues were not present.

**2.** I see the following from *Opponents, etc. v. Petitioners for Form., etc,* 564 S.W.2d 552[3–5], 556 (Mo.App.1978), as apropos here:

"Proof results from evidence which convinces the mind of an ultimate fact. Not all that convinces and so tends to prove an issue constitutes legal evidence, however; it must also be admissible in a court of justice. Hearsay evidence is not of a species not competent to prove a fact, and therefore inadmissable." (Citations omitted.)

that he gained the information concerning the visits of one or more jurors to the accident scene, in the course of juror deliberations. What transpires during the deliberations between fellow jurors cannot be scrutinized because it's an invasion into the sanctity of the jury room. *Further, it is inadmissible hearsay.* As a result, we focus on the testimony of Juror Flippo at the hearing of September 28, 1990."

822 S.W.2d at 888, n. 1 (citation omitted) (emphasis supplied).

The *Stotts* court focused *only* on Flippo's misconduct, i.e., his actual gathering of extrinsic evidence by *personally* visiting the accident scene.

As noted earlier, the ultimate question here is whether juror misconduct *actually occurred* (*Stephens*, 88 S.W.3d at 883); specifically, whether Juror No. 2 *actually gathered* extrinsic evidence. Appellant's allegation that Juror No 2 engaged in such conduct was not self-proving, but had to be proven by him via admissible evidence. *Id.; Stotts*, 822 S.W.2d at 888, n. 1.

The only evidence that Juror No. 2 went outside the record to gather evidence came from fellow jurors who testified about what Juror No. 2 told them. Such evidence was, in my view, clearly hearsay. *Stotts*, 822 S.W.2d at 888, n. 1. See generally, *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 120[2] (Mo.banc 1995) (holding, "[w]hen a witness offers the out-of-court statements of another to prove the truth of the matter asserted in the statement, the testimony is hearsay"); William A. Schroeder, 22A Missouri Practice: Missouri Evidence § 800.1 n. 1 (2000). As such, it was a "species of evidence not competent" to prove the ultimate dispositive fact, i.e., whether Juror No. 2 actually gathered extrinsic evidence. *See Opponents*, 564 S.W.2d at 556[5]. Being inadmissible evidence that was timely objected to, it should not have been considered by the trial judge. *Stotts*, 822 S.W.2d at 888, n. 1.

The fact that the trial judge overruled Respondent's objections to the hearsay evidence is of no consequence. We are to presume that the trial court sorted out the incompetent, irrelevant, and inadmissible evidence and based its decision upon the competent and relevant evidence. *Mullenix–St. Charles Props. v. City of St. Charles*, 983 S.W.2d 550, 557[13] (Mo.App. 1998). Indulging in the presumption that Judge Dally based his decision upon competent and admissible evidence, we are left with a record that wholly fails to show Juror No. 2 gathered extrinsic evidence; consequently, Judge Dally did not abuse his discretion in refusing to grant a new trial based upon alleged juror misconduct.

Second, I have carefully read the more than 1200 pages of trial testimony and other relevant parts of this record, and from that examination, I have concluded that Respondent presented sufficient causation evidence to support the trial court's denial of Appellant's motion for judgment notwithstanding the verdict.

**KERRY L. MONTGOMERY,** Presiding Judge, dissenting.

I respectfully dissent. In my opinion, the trial court erred in denying Appellant's motion for new trial based on juror misconduct in acquiring extra-judicial evidence which prejudiced Appellant.

At the hearing on the motion for new trial, four jurors testified that Juror No. 2 told them she visited the hospital where Appellant worked and either solicited or overheard comments regarding Appellant's prior malpractice claims, the possible loss of his license, and loss of his malpractice insurance. The trial court overruled Respondent's objections to this testimony.

In *Neighbors v. Wolfson*, 926 S.W.2d 35 (Mo.App.1996), the Eastern district of this Court said that "precedents of this state are legion which recite the rule that 'the affidavit or testimony of a juror is inadmissible and is not to be received in evidence for the purpose of impeaching the verdict of a jury' of which the juror was a member." *Id.* at 37. However, *Neighbors* also explained that a juror's testimony can be used to attack the jury verdict if two conditions are met:

First, the party in whose favor the verdict was returned must acquiesce in the proposition that the juror is competent to give such testimony; such acquiescence exists when a party fails to object to admission of both the affidavits containing the juror statements and to the juror testimony offered in court. Second, the juror testimony must allege that extrinsic evidentiary facts (i.e., facts bearing on trial issues but not properly introduced at trial) were interjected into the jury's deliberations, rather than merely that jurors acted on improper motives, reasoning, beliefs or mental operations (the latter type of juror testimony is said to concern "matters inherent in the verdict").

*Id.* (citations omitted).

*Neighbors* and like cases were decided prior to our Supreme Court's decision in *Travis v. Stone*, 66 S.W.3d 1 (Mo. banc 2002). There, a juror visited a traffic accident scene during the break in the trial in order to sort out the testimony of competing experts. The juror denied that her accident scene visit entered into the deliberations in any way. *Id.* at 4.

Initially, the Court considered the propriety of allowing the juror's testimony and said:

The general rule in Missouri is that a juror's testimony about jury misconduct allegedly affecting deliberations may not be used to impeach the jury's verdict. *However, it is permissible to elicit testimony about juror misconduct that occurred outside the jury room, such as the alleged gathering of extrinsic evidence at issue here.* Even where the purpose of testimony regarding the misconduct (whether it occurred inside or outside the jury room) is to impeach the verdict, the party complaining of the testimony must make a timely and proper objection or else the issue is waived.

*Id.* (citations omitted) (emphasis added). After observing that the Defendants did not object to the juror's testimony, the Court decided the testimony was properly received. *Id.*

The majority concludes that *Travis* does not change the rule that a proper objection precludes juror testimony which impeaches the jury's verdict. Recently, *State v. Stephens*, 88 S.W.3d 876 (Mo.App.2002), has interpreted *Travis* as ruling otherwise.

In *Stephens*, the defendant offered evidence at the hearing on his motion for new trial that a juror, during a recess in deliberations, had visited the scene of the alleged assault. *Id.* at 881. The State argued at the hearing "that as a matter of law, the jury's verdict could not be impeached by juror testimony of juror misconduct, as the (defendant) was attempting to do." *Id.* The trial court denied the motion for new trial. On appeal, defendant contended that an exception exists to the general rule where juror misconduct occurs outside, rather than inside, the jury room. *Id.* at 881–82. Defendant relied on *Travis* as stating such an exception, and the Western District of this Court agreed. *Id.* at 882.

In analyzing this issue, the Court determined that *Travis*

... was recognizing that an exception existed as to the general rule prohibiting

juror testimony to impeach the verdict of the jury, the exception being that a juror's testimony, concerning alleged juror misconduct outside the jury room, specifically the gathering of extrinsic evidence as part of an independent investigation, as alleged in our case, could be used to impeach a jury's verdict.

*Id.* at 882.

The State argued that *Travis* did not create an exception to the general rule because the Supreme Court stated that the party complaining of the juror misconduct must make a timely and proper objection or the issue is waived. *See Travis,* 66 S.W.3d at 4. The *Stephens* court rejected this argument by saying:

Contrary to the contention of the State, we fail to see how that language would modify the Court's intent with respect to the express language immediately preceding it. To interpret the Court's opinion as argued for by the State, we would have to totally ignore the express language of the opinion that it is permissible to use juror testimony to impeach a jury verdict where the alleged juror misconduct occurred outside the jury room. Any fair reading of the portion of the opinion in question would lead us to conclude that in including the language championed by the State, the Court was simply recognizing an alternative basis for allowing the juror testimony in question in *Travis* to impeach the jury's verdict and did not intend to cut down the exception it had just recognized in the same paragraph.

*Id.* at 882–83.

I believe the reasoning in that case is sound as it interprets *Travis.* As stated in *Travis,* "[o]ur trial procedures do not contemplate and cannot well tolerate such independent investigation by jurors." 66 S.W.3d at 4. *Travis* clearly condemns the "alleged gathering of extrinsic evidence"

and holds that juror testimony is permissible where the misconduct occurs outside the jury room. *Id.*

Relying on *Travis* and *Stephens,* I would find that the trial court properly admitted the four jurors' testimony. This evidence established that a juror gathered evidence extraneous to the trial. Therefore, the burden shifted to Respondent to show that no prejudice resulted from it. *Travis,* 66 S.W.3d at 4. In this case, Respondent offered no evidence overcoming the presumed prejudice. An important factor in determining prejudice is the materiality of the evidence such as when the evidence gathered pertains to a critical issue in the case. *Id.* at 6. Clearly, Appellant's medical competence was a critical issue in the case, and the gathered evidence portrayed him as medically incompetent. In my view, the trial court abused its discretion in denying the motion for new trial.

The majority opinion determines (1) that Appellant failed to present evidence of juror misconduct because the juror's testimony was hearsay and (2) alternatively, that the trial court determined that Juror No. 2 "may" have told jurors during deliberations about her hospital visit but that the trial court concluded that "she, in fact, never went there." I disagree with both conclusions.

First, I cannot find that the four jurors gave hearsay testimony. As noted by the majority, a statement is not hearsay if the relevance of the statement lies in the mere fact that it was made and no reliance is placed on the credibility of the out-of-court declarant. *Rodriguez v. Suzuki Motor Corp.,* 996 S.W.2d 47, 59 (Mo. banc 1999).

In this case, the relevance of Juror No. 2's statement lies in the mere fact that she brought into the jury room outside information not offered in trial. Whether her information was true or false did not

change the fact that her statement reported the results of an independent factual investigation and Appellant had no opportunity to defend against the inference that he was medically incompetent. I believe the conduct of Juror No. 2 is the very evil that *Travis* intended to thwart, i.e., an independent investigation by a juror with a subsequent report to the jury.

Second, the trial court was "fairly convinced" that Juror No. 2 told the jury about her hospital visit. I interpret this to mean that the trial court believed the testimony of the four jurors. The trial court's observation, quoted by the majority, continues with the trial court simply posing a question of what if this event did not happen. Contrary to the majority opinion, I cannot agree that posing this question equates to a finding that the offending juror never went to the hospital. In fact, the absence of testimony from Juror No. 2 gave the trial court no basis to conclude that she was untruthful.

Finally, I disagree with the majority decision that this Court can draw an adverse inference from the lack of testimony from Juror No. 2. In my view, she was equally available to Respondent who also chose not to call her.

"Failure of a party to call a witness who has knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to offer it." *Kampe v. Colom*, 906 S.W.2d 796, 801 (Mo. App.1995). "To allow argument of a negative inference resulting from a party's failure to produce a witness is reversible error, however, if the witness is equally available to both parties." *Id.* at 802.

In determining whether a witness is equally available to the parties, the following factors are considered:

1. one party's superior means of knowledge of the existence and identity of the witness;
2. the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case; and
3. the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party against the other.

*Hill v. Boles*, 583 S.W.2d 141, 145–46 (Mo. banc 1979).

All of these factors indicate that Juror No. 2 was equally available to Respondent. As to factor 1, both parties had the same knowledge of the existence and identity of the witness. Factor 2 favors Respondent in light of the remarks of Appellant's counsel that the court could assume Juror No. 2 would deny visiting the hospital. The third factor also shows equal availability because the record suggests no relationship with Appellant that would indicate Juror No. 2 might give testimony favorable to him. Therefore, I disagree that an adverse inference can be drawn from Appellant's failure to call Juror No. 2.

If Respondent had called Juror No. 2 to testify and then she denied gathering and reporting extraneous evidence, the trial court could have made a credibility determination. As the record now stands, the trial court did determine that Juror No. 2 actually reported to the jury the results of her independent outside investigation. Her report may have influenced the nine to three verdict in favor of Respondent. Obviously, at least one of the four jurors who testified voted in favor of Respondent.

Therefore, I disagree with the majority opinion which concludes that the offending

juror simply made up her story which she told to the jury and, as a result, her statements should be considered as "matters inherent in the verdict" and privileged. To me, nothing in the record supports such a conclusion.

For the reasons stated, I believe that juror misconduct occurred and that Appellant was prejudiced thereby. I would reverse the judgment and remand the case for a new trial.